EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA
STSV2025000052
HM
APR 24, 2025 03:18 PM
Paige D. Mulligan
Paige D. Mulligan, Clerk
Tattnall County, Georgia

**IN THE STATE COURT OF TATTNALL COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **GEORGE LUCKETT** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION FILE NO:** |
| **v.** | ) |
| | ) |
| **TYRONE OLIVER, in his individual capacity;** | ) |
| **JAMIE CLARK, in his individual capacity;** | ) |
| **BRIAN ADAMS, in his individual capacity;** | ) |
| **JACOB BEASLEY, in his individual capacity;** | ) |
| **KATHY MARTIN, in her individual capacity;** | ) |
| **And** | ) |
| **GEORGIA DEPARTMENT OF** | ) |
| **CORRECTIONS.** | ) |
| | ) **Jury Trial** |
| **Defendants.** | ) **Demanded** |

---

## COMPLAINT FOR DAMAGES

COMES NOW George Luckett (hereinafter referred to as "Plaintiff"), and, by and through undersigned counsel, hereby files this Complaint for Damages against Defendant Tyrone Oliver, in his individual capacity, Defendant Jamie Clark, in his individual capacity, Defendant Brian Adams, in his individual capacity, Defendant Jacob Beasley, in his individual capacity, Defendant Kathy Martin, in her individual capacity, and Defendant Georgia Department of Corrections respectfully showing the Court as follows:

## Preliminary Statement

1.

This is a civil action pursuant to 42 U.S.C. §1983 to redress deprivations, under color of state law, of Plaintiff's clearly established civil rights secured by the Eighth Amendment to the United States Constitution. Claims are hereby filed pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for civil rights violations, unsafe prison conditions, deliberate indifference, deliberate indifference to serious medical needs, cruel and unusual punishment, and supervisory liability.

2.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Smith State Prison officers' and employees' negligent failure to provide medical care towards Plaintiff at Smith State Prison arising from an incident which took place on April 2, 2024. This negligence caused Plaintiff to suffer from prolonged pain and suffering as well as worsened injuries and delayed recovery.

3.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Kathy Martin's, and other Smith State Prison officers' and employees' negligent provision of medical care towards Plaintiff at Smith State Prison arising after an incident which took place on April 2, 2024. This negligent medical care caused Plaintiff to suffer from prolonged pain and suffering as well as worsened injuries and delayed recovery.

## Parties

4.

Plaintiff seeks to recover for claims against Defendants arising under federal and state law. Plaintiff is a resident of Georgia and consents to the venue of Tattnall County.

5.

Defendant Tyrone Oliver, at all times relevant to this Complaint, was the Commissioner of the Georgia Department of Corrections and was acting in the course and scope of his employment and under color of law. Defendant Tyrone Oliver, (hereinafter referred to as "Defendant Oliver") is sued herein in his individual capacity for purposes of his actions and policies and staffing of law enforcement personnel under his control and supervision and for establishing a policy or pattern of widespread constitutional deprivations at Georgia prisons, which includes Smith State Prison.

6.

Defendant Oliver can be served at his place of employment.

7.

Defendant Oliver is a Policy Maker for Georgia prisons, which includes Smith State Prison.

8.

Defendant Jamie Clark, at all times relevant to this Complaint, was the Director of Engineering and Construction Services for the Georgia Department of Corrections and was acting in the course and scope of his employment and under color of law. Defendant Jamie Clark (hereinafter referred to as "Defendant Clark") is sued herein in his individual capacity for purposes of his actions and policies and supervision of the maintenance of dilapidated Georgia prison facilities, which includes Smith State Prison.

9.

Defendant Clark is a Policy Maker for Georgia prisons, which includes Smith State Prison.

10.

Defendant Clark can be served at his place of employment.

11.

Defendant Brian Adams, up until February 8, 2023, was the warden of Smith State Prison and was acting in the course and scope of his employment and under the color of law. Defendant Brian Adams, (hereinafter referred to as "Defendant Adams") is sued herein in his individual capacity for purposes of his actions and policies and supervision of law enforcement personnel under his control and for establishing a policy or pattern of widespread constitutional deprivations at Smith State Prison.

12.

Defendant Adams was a Policy Maker for Smith State Prison

13.

Defendant Adams can be served at his residence or place of employment.

14.

Defendant Jacob Beasley, after March 1, 2023, was the warden of Smith State Prison and was acting in the course and scope of his employment and under the color of law. Defendant Jacob Beasley, (hereinafter referred to as "Defendant Beasley") is sued herein in his individual capacity for purposes of his actions and policies and supervision of law enforcement personnel under his control and for establishing a policy or pattern of widespread constitutional deprivations at Smith State Prison.

15.

Defendant Beasley was a Policy Maker for Smith State Prison.

16.

Defendant Beasley can be served at his residence or place of employment.

17.

Smith State Prison receives some form of federal funding.

18.

Defendant Kathy Martin (hereinafter referred to as "Defendant Martin") was at all relevant times an employee at Smith State Prison and was acting under color

of state law and was acting in the course and scope of her employment at the time the subject incidents occurred.

19.

Defendant Martin was a Unit Manager at Smith State Prison and is sued for her personal participation and supervision in the subject incidents.

20.

Defendant Martin is a resident of Georgia and can be served at her place of employment or residence.

21.

Pursuant to O.C.G.A §50-21-23, the State of Georgia waived its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

22.

The State of Georgia's waiver of sovereign immunity applies to the negligence claims in this case.

23.

Defendant Georgia Department of Corrections is the State government entity, which employed Unit Manager Martin and other Smith State Prison officers and employees at the time the subject incidents occurred.

24.

Unit Manager Martin was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of her employment and in the course and scope of her official duties at all relevant times to this Complaint.

25.

Other Smith State Prison officers and employees were State officers or employees who were acting on behalf of Defendant Georgia Department of Corrections in the course and scope of their employment and in the course and scope of their official duties at all relevant times to this Complaint.

26.

Defendant Georgia Department of Corrections and the State of Georgia are liable to Plaintiff for the torts of Unit Manager Martin, and other Smith State Prison officers and employees, which were committed in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

27.

Defendant GDC may be served as consistent with the Georgia Tort Claims Act.

28.

At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other. Each Defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other Defendants, but each Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

**Jurisdiction & Venue**

29.

Venue is proper in this Court pursuant to O.C.G.A. § 50-21-28 as the tort giving rise to the loss occurred in Tattnall County.

30.

Defendants' conduct under color of state law proximately caused the deprivation of Plaintiff's federally protected rights, injuries, and pain and suffering.

31.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, the 14th and 8th Amendment to the United States Constitution, and relevant Georgia law.

32.

Notice of Claim pursuant to O.C.G.A §50-21-26 has been sufficiently and timely sent in this case. An ante-litem notice sent in this case is attached as Exhibit A.

33.

This action has been brought within 2 years of the subject incidents.

34.

All claims which arise out of the facts and circumstances relating to the commission of the alleged crime committed in this case, the beating and stabbing of Plaintiff, are tolled by operation of O.C.G.A. §9-3-99 from the date of the commission of the alleged crime, April 28, 2023, until the prosecution of such crime or act has become final or otherwise terminated.

35.

This Court has personal jurisdiction over Defendant Oliver.

36.

This Court has personal jurisdiction over Defendant Clark.

37.

This Court has personal jurisdiction over Defendant Adams.

38.

This Court has personal jurisdiction over Defendant Beasley.

39.

This Court has personal jurisdiction over Defendant Martin.

40.

This Court has personal jurisdiction over Defendant Georgia Department of Corrections.

**<u>Facts Related to All Counts</u>**

41.

Plaintiff was in the custody of the Smith State Prison serving a sentence in April of 2023.

42.

Plaintiff was attacked in Smith State Prison on April 28th, 2023 (hereinafter referred to as the "Attack").

43.

On the day of Plaintiff's Attack, there were no guards around the area where he was attacked.

44.

On the day that Plaintiff was attacked, the prison was understaffed.

45.

During the Attack, Plaintiff was brutally attacked and stabbed multiple times.

46.

During the Attack, Plaintiff was stabbed several times by a gang of people while coming from the kitchen to the dorm.

47.

During the Attack, many of the men were wielding makeshift sharpened weapons.

48.

During the Attack, Plaintiff was stabbed by these makeshift sharpened weapons.

49.

Upon information and belief, such makeshift sharpened weapons were made from the crumbling infrastructure of the prison and were likely taken from locker boxes, vents in the cells, beds, and/or anywhere where there was metal available.

50.

After the Attack, Plaintiff was suffering from life-threatening injuries.

51.

As a result of the Attack, Plaintiff sustained at least 14 stab wounds all over his body and fractures to his face.

52.

As a result of the Attack, Plaintiff suffered from a left orbital floor fracture and maxillary sinus fracture.

53.

As a result of the Attack, Plaintiff sustained one complex laceration of the left eyelid.

54.

Such injuries described in the above allegations were serious in nature and required immediate treatment at a hospital.

55.

After the Attack, Plaintiff was bleeding, covered in blood, and suffering from obvious life-threatening injuries and Defendant GDC's employees/officers were aware of this.

56.

Defendant GDC's employees/officers had the means and the authority to treat Plaintiff's bleeding wounds and other injuries.

57.

Plaintiff did not receive adequate medical attention from Defendant GDC's employees and officers directly after the Attack.

58.

Plaintiff did not receive adequate medical attention after the Attack from Defendant GDC's employees and officers for at least 30-35 minutes, as Plaintiff sat in the presence of those employees and officers while bleeding and suffering from serious medical injuries without such employees and officers attempting to stop the bleeding and without receiving sufficient medical care.

59.

Medical attention was only provided to Plaintiff once the EMS personnel arrived and it was provided by EMTs.

60.

After the Attack, Plaintiff was taken to the hospital.

61.

At the hospital, Plaintiff told providers: "I can't see at all out of my eye".

62.

At the hospital, Plaintiff reported pain at a level of 10/10 to the head, left side, and left lower extremity.

63.

At the hospital, Plaintiff began coughing up blood.

64.

Furthermore, at the hospital, providers saw scattered skin lacerations which appeared deepest at the level of the left flank with gas extending to the fascial

planes of the oblique musculature with tiny underlying lateral abdominal wall fat filled hernia measuring 8 mm.

65.

Plaintiff suffered from a single 5 cm laceration to the back of the skull which was repaired with 5 staples at the hospital.

66.

At the hospital, providers classified Plaintiff's injuries as "acute illness or injury that poses a threat to life or bodily functions".

67.

According to providers at the hospital, Plaintiff "presented to the ER as a trauma level 1 activation and has the potential to be critically injured with a high probability of a sudden significant deterioration in condition requiring constant medical attention and the highest level of preparedness to intervene urgently."

68.

According to providers at the hospital, "Patient will need to have scalp staples removed in 7-10 days by any provider."

69.

Plaintiff received other staples and stitches at the hospital which medically required removal after Plaintiff's treatment at the hospital. Such staples and

stitches were located on his eye and all over his body where he sustained stab wounds.

70.

GDC officials told media that no weapons were involved in the Attack even though makeshift sharpened blades were used in the Attack.

71.

After the Attack and after Plaintiff returned to Smith State Prison from the hospital, Plaintiff was placed in a holding cell for around two days while the prison staff sought a room for him. During this time, GDC employees and officers did not provide medical attention to Plaintiff.

72.

After staying in the holding cell, Plaintiff was placed in solitary confinement.

73.

When Plaintiff returned to Smith State Prison, he continued to cough up blood, required care for his stab wounds, and required care for his maimed eye.

74.

As of May 17, 2023, Plaintiff was not receiving the medical care he needed due to Defendant Martin refusing to have him taken to the medical wing.

75.

In May of 2023, Defendant Martin did not let Plaintiff go to medical to get stitches out.

76.

When refusing to allow Plaintiff to go to the medical wing to allow for him to get his stitches out, Defendant Martin would make little jokes and say things like "if it wasn't for me your ass wouldn't be living".

77.

When refusing to allow Plaintiff to go to the medical wing to allow for him to get his stitches out, Defendant Martin would say things like, "you know we don't have any officers Luckett" and "you living, you'll be alright".

78.

In May of 2023, Unit Manager Sharpe told Plaintiff that he couldn't go to medical to have his stitches taken out because of a lack of staff.

79.

Eventually, when one of the Prison nurses did come to solitary confinement where Plaintiff was staying to do pill call, she saw that Plaintiff had stitches that were stuck in his eyelid, and she ended up calling Plaintiff to medical to have the stitches taken out.

80.

During Plaintiff's time after the Attack at Smith State Prison, Defendant Martin forced Plaintiff to wait several days for his stitches and staples to be taken out.

81.

Because many of Plaintiff's requests to have his staples and stitches taken out kept getting denied, Plaintiff was forced to attempt to take some of his staples and stitches out without medical providers in his cell.

82.

In May of 2023, Plaintiff was denied eye specialist appointments by Defendant Martin for his eye injuries.

83.

In May of 2023, Plaintiff was denied medical treatment by Defendant Martin relating to his coughing up of blood.

84.

In May of 2023, Plaintiff would notify GDC employees that Plaintiff was coughing up blood and suffering from related medical issues but the GDC employees would not provide or seek out medical care for Plaintiff and say things like "we are understaffed".

85.

In May of 2023, when denying Plaintiff's medical care, Wellpath nurses conducting pill calls and GDC employees cited security staffing for their inability to provide medical care. Such employees would say things like, it's up to security to bring Plaintiff up to medical.

86.

In August of 2023, Plaintiff was still not receiving sufficient medical attention for his serious injuries and was experiencing grey spots and blurred vision in his right eye.

87.

In September of 2023, Plaintiff was still being denied proper medical treatment and needed surgery on his eye to prevent the worsening of his vision as well as potential blindness.

88.

As of September of 2023, Plaintiff had still been in solitary confinement since the Attack.

89.

Plaintiff incurred significant medical bills as a result of all of the incidents described above.

90.

The incidents described above caused Plaintiff to suffer physical and mental pain and suffering.

91.

Plaintiff's injuries persisted long after the Attack.

92.

As a result of the incidents described above, Plaintiff had been concerned about permanently losing his vision, which had caused him much mental anguish.

93.

Plaintiff will continue to suffer physical and mental pain and suffering from these incidents in the future.

94.

Plaintiff will likely require serious future medical care. He may require plastic surgery to correct his deformities and scars.

**Additional Facts Related to Count VI, Count VII, and Count VIII**

95.

Smith State Prison, a close security facility that can house more than 1,500 inmates, has proven in recent years to be one of the state's more problematic. Six inmates were murdered there in 2021, the most of any Georgia prison that year.

96.

Smith State Prison officials, including Defendant Adams, have come under fire for the mounting violence, free flow of contraband, understaffing, and unsanitary conditions at Smith State Prison. As indicated throughout this Complaint, Plaintiff has suffered as a direct result of these issues.

97.

Defendant Adams was the Warden at Smith State Prison up until February 8, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

98.

Defendant Adams's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

99.

Defendant Beasley was the Warden at Smith State Prison after March 1, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

100.

Defendant Beasley's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

101.

Defendant Adams had been with the Georgia Department of Corrections since 1997, starting as a correctional officer.

102.

Defendant Adams had been Warden at Smith State Prison, one of the state's most dangerous facilities, since October 2019.

103.

Since Defendant Adams took the helm at the prison in 2019, Smith State Prison had experienced a steady decline; Violence had skyrocketed, conditions for inmates inside had deteriorated at an unprecedented rate, assaults on staff had increased with little to no disciplinary action taken against offenders, and staffing for the Smith State Prison remained at an all-time low with some shifts having just one correctional officer to manage all of the dorms alone. Plaintiff suffered as a direct result of these issues as when Plaintiff was attacked, Smith State Prison was short staffed.

104.

On February 8, 2023, the Georgia Bureau of Investigations (hereinafter referred to as "GBI") arrested Defendant Adams on charges that he received cash payments as part of a widespread contraband operation at Smith State Prison.

105.

Defendant Adams was charged with False statements and writings; concealment of facts (O.C.G.A. § 16-10-20), Violation of oath by public officer (O.C.G.A. § 16-10-1), Bribery (O.C.G.A. § 16-10-2), and violations under the RICO Act (O.C.G.A. § 16-14-1).

106.

Upon information and belief, during Defendant Adams's reign over Smith State Prison, he received U.S. currency through a pattern of racketeering activity associated with the Yves Saint Laurent Squad, a smuggling ring operating inside the prison. Such activities led to increases in prison violence and contraband and ultimately led to the Attack on Plaintiff.

107.

Upon information and belief, Defendant Adams provided false statements to a GBI special agent in an April 2022 interview when he contended that he had not been solicited or bribed by an inmate during the previous 10 years.

108.

Evidence of this extensive contraband smuggling ring based at the prison was discovered amid a GBI investigation of the murder of 88-year-old Bobby Carlton Kicklighter in Glennville.

109.

Mr. Kicklighter was killed at his home in what has been described as a hit intended for his neighbor, an officer at the prison who reportedly had stood up to contraband smuggling at the facility.

110.

The GBI began looking into the alleged corruption in May 2022, a month after an inmate, Nathan Weekes, and three others were indicted in connection with Kicklighter's slaying.

111.

According to GBI Director Vic Reynolds, "That was actually a hit ordered on a correction officer who was a straight-up, righteous guard who couldn't be bought, couldn't be intimidated, couldn't be threatened,".

112.

The central figure in the alleged murder and contraband smuggling plot was Weekes, 26, a Lithonia resident who entered the prison system in 2021 to serve a 17-year sentence for committing a string of armed robberies in DeKalb County.

113.

The May 2022 indictment accused him of directing an associate on the outside, Christopher Sumlin, who broke into Kicklighter's house and shot the man to death. Sumlin was also an inmate at Smith until he was released on parole in October 2020.

114.

According to the indictment, Weekes was known at Smith as "Kash" or "Da President" of the Yves Saint Laurent Squad, a multimillion-dollar contraband ring operating inside the prison. The indictment described the ring as a criminal enterprise that worked to move cellphones, drugs, jewelry, designer clothing, cash and other prohibited items into the prison.

115.

Weekes used girlfriends and others on the outside to further his interests. He also bribed and intimidated corrections officers.

116.

The indictment also said that members of the gang were involved in two other murders.

a. One was the June 2021 murder of former correctional officer Jessica Gerling, who was arrested a year earlier for bringing contraband into the prison;

b. The other was the January 2021 murder of Jerry Lee Davis, a truck driver who made frequent deliveries to the prison.

117.

The same indictment also shed light on another aggravated assault against a Smith State Prison C.O., and it implicated additional parties who reportedly assisted in the furtherance of the criminal enterprise.

118.

The indictment detailed the multi-million-dollar operation in which inmates were responsible for bringing in designer shoes and clothing, diamond and gold jewelry, drugs, and other items into Smith State Prison.

119.

While Warden Adams approved the purchase of video game consoles and flat screen televisions as rewards for inmates, the Smith State Prison facility itself was seemingly overrun with pests, rodents, and filthy mold and mildew.

120.

Despite the overwhelming amount of evidence, to include photos and videos of the items, the issues continued. Additionally, Adams remained Warden.

121.

The Georgia Department of Correction's lack of action prompted questions from a public concerned with the well-being and safety of the nearby Glennville community. Concerns only escalated as ways the prison has directly impacted the public continue on unaddressed.

122.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Prison's crumbling infrastructure, which inmates use to craft makeshift knives, called "shanks," for use as weapons. Such shanks were used in the Attack to harm and maim Plaintiff.

123.

At Smith State Prison, weapons came off of lockers, off of walls, and off of beds.

124.

Furthermore, at Smith State Prison, contraband was able to be hidden under the sink and the sides of the sink were dilapidated.

125.

At Smith State Prison, inmates would travel through the walls and through the ceilings. Inmates would go on top of the building through holes in the ceiling in order to smuggle contraband.

126.

Gross deficiencies in Smith State Prison's provision of medical care, caused by Defendant Beasley's supervision, exposed Plaintiff to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for at least half an hour after

he was attacked and did not receive constitutionally adequate medical care for a period of weeks while in solitary confinement.

127.

Defendant Adams and Defendant Beasley had actual and constructive knowledge of widespread, constitutional violations occurring at Smith State Prison, including the persistent pattern of inmate-on-inmate violence at the Smith State Prison.

128.

Defendant Adams and Defendant Beasley instituted a policy of widespread constitutional deprivations at Smith State Prison resulting in unacceptable and unconstitutional levels of inmate-on-inmate violence.

129.

Defendant Adams and Defendant Beasley were aware of the substantial risk of danger the Smith State Prison posed to inmates, but they had been deliberately indifferent to such risks.

130.

Violent acts by incarcerated people against other incarcerated people at Smith State Prison were common and included homicides, stabbings, and sexual abuse.

131.

Killings, stabbings, and assaults were common at Smith State Prison. Plaintiff was a victim of assault and stabbing at Smith State Prison.

132.

Assaults and stabbings with man-made "shanks" were a feature of life at Smith State Prison. Plaintiff was stabbed with a man-made shank at Smith State Prison.

133.

There were at least 17 homicides at Smith State Prison between 2020 and 2023.

134.

Such Smith State Prison homicides include but are not limited to:

a. Taylor Harrison Brooks, 26: (died April 10, 2020) multiple stab wounds.

b. John Bretleir Reyes Cardona, 24: (April 20, 2020) exsanguination (severe loss of blood) from stab wound to neck.

c. Justin Nathaniel Wilkerson, 25: (Jan. 5, 2021) asphyxia, neck compression. During a hearing at the Georgia Legislature, his mother testified he had mental health diagnoses of schizophrenia and bipolar disorder and previously had been attacked in prison.

d. Desmond Hill, 35: (April 9, 2021) strangulation. According to a family member, the day before his death he call his mother and reported that he was in "the hole" with a cellmate who said he was going to kill him.

e. Hiwatha Abdulcah Hakeem Jr., 26: (April 12, 2021) multiple stab wounds. Incident report shows four other prisoners involved. A lawsuit alleges the four who attacked him had a history of violence toward others and that when he sought medical help after the assault, prison officials failed to provide timely and adequate care.

f. Derrick Dionte Deshun Harvey, 26: (June 25, 2021) stab wound to chest.

g. Christopher Ray Reynolds, 38: (July 1, 2021) blunt and sharp force injuries to head and neck.

h. Christopher Michael Redwine, 45: (Sept. 27, 2021) asphyxia due to manual strangulation.

i. Nathan Michael Mahan, 37: (Oct. 23, 2022) stab wounds

j. Randy O'Neal Wynn, 54: (March 2, 2023) homicide.

k. Anthony Joseph Zino III, 71: (2023) asphyxia, neck compression inflicted by other. The local coroner noted that the body was badly

decomposed and the man likely had been dead for days before being discovered.

l. Calvin Darrell Denson Jr., 31: (2023) stab wound to chest. The GDC said seven inmates were involved in a fight.

m. Shaquan Jahrel Boykins, 31: (2023) blunt impact injuries to head

n. Justin Tyler Smith, 37: (2023) epidural hematoma (bleeding between the brain membrane and the skull), blunt force injury to head. The medical examiner said Smith was punched and fell to the ground, striking his head.

o. Quenton G. Mayo, 30: (2023) stab wounds to neck. Incident report data shows four prisoners involved.

p. Correctional Officer Robert Danford Clark, 42: (2023) multiple stab wounds. He was attacked by an inmate.

q. James Adams Jr., 72: (2023) blunt force trauma to head and neck.

135.

Many other incidents of violence have occurred at Smith State Prison during this period of time.

136.

Leading up to Plaintiff's Attack, Smith State Prison experienced high levels of violence:

a. On March 6, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The incident involved a make-shift knife. The incident was not forwarded for investigation.

b. On March 9, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The victim was assaulted by unknown assailants. The incident was not forwarded for investigation.

c. On March 13, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. This inmate was stabbed by an unknown assailant and the weapon was not recovered. The incident was not forwarded for investigation.

d. On March 15, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The incident was not forwarded for investigation.

e. On March 17, 2023, an inmate-on-inmate assault occurred which resulted in serious injury. The incident was not forwarded for investigation.

f. On March 18, 2023, a fight occurred which resulted in serious injury and outside medical treatment. The fight involved multiple inmates

and makeshift weapons. The incident was not forwarded for investigation.

g. On March 23, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The victim was bleeding about the head and face and was attacked by multiple unknown assailants. The incident was not forwarded for investigation.

h. On April 1, 2023, an inmate-on-inmate assault occurred resulting in injuries and a hospital transport. The incident was not forwarded for investigation.

i. On April 1, 2023, an inmate-on-inmate assault occurred resulting in injuries. The assault involved a man-made weapon. The incident was not forwarded for investigation.

j. On April 2, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The assault occurred while no guards were around and the attacker's identity is unknown. The incident was not forwarded for investigation.

k. On April 7, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The incident was not forwarded for investigation.

137.

Inadequate supervision by Defendant Beasley put incarcerated people, including Plaintiff, at substantial risks of serious harm from violence and violated their constitutional rights, especially when other conditions like easy access to weapons contribute to the danger.

138.

At relevant times herein, due to the supervision of Defendant Beasley, Smith State Prison Correctional Officers were rarely present in the housing units and did not perform adequate security rounds or otherwise monitor people to prevent harm. These failures led to the Attack onto Plaintiff as there were no guards present in the area during the Attack and the prison was understaffed during the Attack.

139.

As a result of the understaffing and inadequate supervision of Defendant Beasley, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents. This led to the Attack onto Plaintiff.

140.

Defendant Adams and Defendant Beasley are aware of the violence in the Smith State Prison. Yet they have failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts which continue at dangerous levels.

141.

Smith State Prison, due to the supervision, staffing, customs, and practices of Defendant Adams and Defendant Beasley, regularly operated without enough security staff to provide appropriate supervision and prevent violence. These failures led to the Attack onto Plaintiff.

142.

Violence occurs as a direct result of the understaffing, which was caused by Defendant Beasley.

143.

Defendant Adams and Defendant Beasley were aware of chronic short staffing and failures to be present around inmates during all relevant times to this Complaint.

144.

Poor maintenance and pervasive contraband, caused by the supervision, custom, and direction of Defendant Adams and Defendant Beasley contributed to the violence at Smith State Prison, including the violence that Plaintiff was a victim of during the Attack.

145.

In fact, Defendant Adams was charged with participating in a smuggling ring operating inside the prison which led to increases in prison violence and contraband.

146.

While Defendant Adams was no longer the warden at the time of Plaintiff's Attack, the harms created by his illegal smuggling activity had not been corrected, and this in part caused Plaintiff's Attack and injuries.

147.

Poor supervision, prison maintenance, and security practices, caused by the supervision and actions of Defendant Adams and Defendant Beasley to a large amount of contraband, including weapons and drugs, and unsafe facilities. These failures led to the Attack onto Plaintiff.

148.

Defendant Adams and Defendant Beasley were aware of the danger these conditions pose to incarcerated people but failed to take adequate action to make Smith State Prison safe.

149.

Unmaintained parts of Smith State Prison, caused by the supervision of Defendant Adams and Defendant Beasley, jeopardized inmate safety and provided the makeshift weapons for the Attack onto Plaintiff.

150.

Due to poor maintenance leadership by Defendant Adams and Defendant Beasley, Smith State Prison itself was a source of dangerous weapons, exposed people to violence, and provided makeshift weapons for the Attack onto Plaintiff.

151.

Defendant Adams and Defendant Beasley did not take appropriate measures to prevent the movement of contraband, including shanks, into and around the prison. These failures led to the Attack onto Plaintiff.

152.

In fact, Defendant Adams was charged with participating in a smuggling ring operating inside the prison which led to increases in prison violence and contraband.

153.

Corrupt staff, such as Defendant Adams and others were also a significant source of contraband at Smith State Prison.

154.

Multiple staff members have been arrested for trafficking contraband into Smith State Prison.

155.

Defendant Adams and Defendant Beasley were aware of the dangers caused by the facility's poor condition, including providing materials for weapons.

156.

Poor security practices by Defendant Adams and Defendant Beasley contributed to the large amounts of contraband, including shanks, that moved into and about Smith State Prison. These failures led to the Attack onto Plaintiff.

157.

Smith State Prison staff, due to the supervision, staffing, customs, and practices of Defendant Beasley, did not conduct adequate security rounds to identify and remove contraband. These failures led to the Attack onto Plaintiff.

158.

Planned housing searches were not conducted with necessary frequency, and searches of incarcerated people, including pat searches, were not conducted appropriately. This custom, practice, and supervision by Defendant Beasley led to the Attack onto Plaintiff.

159.

Significant contraband was being trafficked at Smith State Prison leading up to and directly after the Attack onto Plaintiff.

160.

The following is a non-exhaustive list of contraband which was found at Smith State Prison leading up to and after the Attack onto Plaintiff:

a. On January 3, 2023, 1 gray Alcatel cell phone and 4 grams of marijuana were recovered from the common area
b. On January 4, 2023, one 9 inch make-shift shank, metal object sharpened to a point, was found
c. On January 9, 2023, 13 homemade weapons ranging from 9 inches to 17 inches in size were recovered from the shower area
d. On January 11, 2023, two make-shift shanks, metal objects sharpened to a point, were found
e. On January 12, 2023, one 6 inch make-shift shank, metal object sharpened to a point, and another 11.5 inch shank were found
f. On January 12, 2023, one 10 inch make-shift shank, metal object sharpened to a point, and another 9 inch shank were found
g. On January 12, 2023, one 7 inch make-shift shank, metal object sharpened to a point, and another 8 inch shank were found
h. On January 29, 2023, while patrolling the area outside the prison, Glennville Police Department conducted a traffic stop on a black Nissan Altima. A search was conducted and 06 bundles of unknown contraband and a 9mm semi-automatic handgun were recovered.

i. On February 10, 2023, while conducting a perimeter search around the property, 5 large black trash bags were found.

j. On February 13, 2023, a metal homemade weapon measuring 19.5 inches, sharpened to a point on one end was found

k. On February 19, 2023, 2 homemade weapons measuring approximately 17 inches made of metal sharpened to a point on one end with torn cloth wrapped around the other end to form a handle were found

l. On February 19, 2023, 2 homemade weapons measuring approximately 05 inches made of metal sharpened to a point on one end and the other wrapped with a torn cloth to form a handle were found

m. On February 20, 2023, 3 homemade weapons, measuring from 8 inches to 21 inches sharpened to a point with a cloth on the other end to form a handle were found

n. On March 3, 2023, a weapon (piece of metal) approximately 11 inches, sharpened to a point on one end and a handle on the other end was found

o. On March 4, 2023, 13 pieces of metal in various sizes were found in a pipe chase and utility closet

p. On March 13, 2023, a sharpened weapon was found

q. On March 16, 2023, hard contraband was found so much so that the case is still open to an open investigation

r. On April 4, 2023, a man-made shank measuring 15 inches and a man-made shank measuring 6 inches were found.

161.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Beasley, had inadequate systems for identifying, investigating, and preventing violence. These failures led to the Attack onto Plaintiff.

162.

Given the amount of violence at Smith State Prison, procedures to identify dangerous circumstances and investigate misconduct are critical.

163.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Adams and Defendant Beasley did not meaningfully investigate the root causes of violence in the prison. These failures led to the Attack onto Plaintiff.

164.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Adams and Defendant Beasley does not use quality investigations to

identify dangerous situations and avoid violence. These failures led to the Attack onto Plaintiff.

165.

After an incident of serious violence occurs or when correctional staff are alerted to a potential for serious violence, sound correctional practice includes a thorough investigation to identify the source of the violence, determine what led to the violence or threats, and identify corrective actions. As seen above, many acts of violence were not referred for further investigation.

166.

Corrective actions may include increasing staffing, addressing blind-spots, counseling staff to improve the quality of security rounds, re-balancing the mix of different gangs on a housing zone, and identifying the source of involved contraband.

167.

Without such investigations and corrective actions, staff cannot adequately identify or respond to patterns of violence and prevent it from recurring.

168.

Smith State Prison fails to provide constitutionally adequate medical care to people at the prison. Plaintiff's medical care after the Attack as well as while he was in solitary confinement was constitutionally deficient due to these issues.

169.

Gross deficiencies in the prison's provision of medical care, as a result of the supervision, custom, staffing, and practices of Defendant Beasley, exposed incarcerated people to an increased risk of injury, serious illness, pain and suffering, and death. Plaintiff's medical care during and after the Attack was constitutionally deficient due to these issues as well as the lack of staff.

170.

Unsafe prison conditions, caused by Defendant Adams's and Defendant Beasley's supervision, restricted access to medical care and led to constitutionally deficient care. Plaintiff's medical care during and after the Attack was constitutionally deficient due to these issues as the treatment of his bleeding wounds was delayed and staff cited a shortage of staffing as the reason for failing to take Plaintiff to the medical wing.

171.

Smith State Prison, as a result of supervision, custom, staffing, and practices of Defendant Beasley, fails to provide appropriate medical aid in life-or-death situations. Plaintiff's medical care during and after the Attack was constitutionally deficient due to these issues as the treatment of his bleeding wounds was delayed.

172.

Correctional and medical staff have an obligation to respond to people experiencing medical emergencies in prisons.

173.

When correctional officers encounter an incarcerated person experiencing a medical emergency, they should notify medical staff and provide a basic first-responder level of care.

174.

This includes, as appropriate, starting CPR, applying bandages to wounds, using an automated external defibrillator (AED), administering naloxone, or placing the patient in a recovery position to open the airway. This also includes calling for an ambulance when the incarcerated person's injuries are serious enough.

175.

In Plaintiff's case, he needed bandages to be applied to stop the bleeding and his lungs needed to be assessed, but he was left to bleed for a period of at least half an hour while waiting for emergency services.

176.

Security and staffing problems, caused by Defendant Beasley, affect all aspects of healthcare in Smith State Prison, including Plaintiff's healthcare after the Attack.

177.

The conditions at Smith State Prison—including high levels of violence, poor supervision, poor management, and an inadequately maintained facility—unreasonably impeded incarcerated people with serious medical needs from accessing necessary care. Plaintiff's medical care during and after the Attack was constitutionally deficient due to these issues.

178.

Defendant Beasley was aware of the inadequate medical care in the Smith State Prison but failed to take reasonable measures to improve care.

179.

Many of these issues stem from Defendant Adams's and Defendant Beasley's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

180.

The constitutional deprivations at Smith State Prison described herein led directly to the Attack onto Plaintiff as well as the deficient medical care he received afterwards.

**Additional Facts Related to Count IV and Count V**

181.

Georgia is the eighth most populous state in the United States and has the fourth-highest state prison population.

182.

The Georgia Department of Corrections (hereinafter referred to as "GDC") incarcerates almost 50,000 people in 34 state-operated prisons and 4 private prisons, ranging in capacity from fewer than 500 to more than 2,500 beds.

183.

More than 32,000 of GDC's population are classified as medium security and more than 11,600 are classified as close security. Smith State Prison is one of GDC's close security prisons.

184.

According to the GDC, persons incarcerated at the "close" security level "are escape risks, have assault histories, and may have detainers for other serious crimes on file," and "require supervision at all times by a correctional officer."

185.

The GDC operates on a $1.2 billion budget.

186.

The GDC's Commissioner is Tyrone Oliver, who took over the role in January 2023, after Timothy Ward, the previous Commissioner, retired.

187.

The Commissioner reports to the State Board of Corrections and the Governor.

188.

Defendant Oliver is responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

189.

At all relevant times, Defendant Clark was responsible for management and oversight of the ECS division, which is responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

190.

The incarcerated population in the Georgia prison system, which includes Smith State Prison, faces a substantial risk of serious harm due to failing systems, particularly security staffing. Plaintiff suffered as a direct result of this.

191.

Staffing levels vary across the prisons, which includes Smith State Prison, with correctional officer (CO) vacancy rates around 50% systemwide and over 70% at ten of the largest facilities.

192.

The average CO vacancy rate at its Georgia prisons, which includes Smith State Prison, was 49.3% in 2021, 56.3% in 2022, and 52.5% in 2023.

193.

At many of Georgia's close-and medium-security prisons, with high levels of violence, CO vacancy rates are even higher.

194.

By December 2023, 18 Georgia prisons had CO vacancy rates over 60%, and 10 of those were over 70%.

195.

The circumstances within Georgia's prisons, which includes Smith State Prison, represent inaction by Defendant Oliver and Defendant Clark to address a growing and changing incarcerated population, aging infrastructure, and years of declining staffing rates. Plaintiff suffered as a direct result of this.

196.

With security staffing at such low levels, caused by Defendant Oliver's staffing practices, violence and criminal activity proliferate in the prisons. Plaintiff was a victim of such violence.

197.

Through the policies, supervision, and practices of Defendant Oliver, Georgia prisons fail to stop and to respond appropriately to homicides, life-threatening and

other serious violence, and sexual abuse. Plaintiff was a victim of life-threatening and other serious violence.

198.

Over the six-year period from 2018 through 2023, the GDC reported a total of 142 homicides in its prisons, which includes Smith State Prison, with 48 in the first three years and a 95.8% increase in the latter three years, with 94 homicides.

199.

The rate of homicides in Georgia prisons, which includes Smith State Prison, significantly exceeds the most recent available national data on homicide rates in correctional facilities.

200.

The violence and dysfunction that plagues Georgia Prisons has met the threshold to draw attention from the federal government.

201.

In 2016, the Department of Justice (hereinafter referred to as "DOJ") launched a statewide investigation into whether the Georgia prison system adequately protects incarcerated persons who are LGBTI from sexual abuse by staff and by other incarcerated persons.

202.

In 2021, the DOJ expanded the investigation to include protection of all incarcerated persons at the medium-and close-security-level prisons, which includes Smith State Prison, from violence by other incarcerated persons.

203.

The investigation was conducted jointly by the Special Litigation Section of the Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia.

204.

As part of the investigation, between 2022 and 2023, DOJ visited 17 Georgia prisons, – about half of the state prisons – representing geographically and demographically diverse areas throughout the state and correctional populations that are the focus of this investigation.

205.

As part of this investigation, the DOJ visited the following prisons in 2022 and 2023: Lee Arrendale State Prison, Ware State Prison, Hays State Prison, Walker State Prison, Calhoun State Prison, Pulaski State Prison, Baldwin State Prison, Georgia Diagnostic and Classification Prison, Macon State Prison, Coastal State Prison, Smith State Prison, Telfair State Prison, Rogers State Prison, Dooly State Prison, Wilcox State Prison, Phillips State Prison, and Augusta State Medical Prison.

206.

The DOJ conducted hundreds of private, one-on-one interviews with incarcerated persons and many more brief conversations while touring the facilities; conducted several dozen interviews with GDC facility staff, investigators, and executive leadership; conducted additional interviews with local coroners, first responders, prosecutors, and employees from other Georgia state agencies; and reviewed tens of thousands of records from GDC, other Georgia state agencies, and third-party entities such as local coroners, EMS providers, and community stakeholders.

207.

The DOJ also reviewed thousands of additional records, including documents from third parties and stakeholders, court records from third-party cases, historical sources, and public reports.

208.

The DOJ worked with four highly qualified expert consultants in conducting this investigation.

a. One was a former high-level state corrections official with decades of experience working in and running state prisons.

b. One was a former law enforcement official who served in a leadership role in a large county jail system, with expertise in data analysis, policy implementation, and staffing assessments.

c. Two were certified Prison Rape Elimination Act (PREA) auditors with specialized expertise in sexual safety in correctional environments, one of whom served as a former inspector general of a state prison system.

209.

As has Plaintiff, even the DOJ has been through significant difficulties in obtaining documents from the GDC regarding the relevant conditions and acts of violence, including Plaintiff's Attack, at Georgia prisons, which includes Smith State Prison:

a. Shortly after launching the expanded investigation in September 2021, DOJ issued a first request for documents to GDC.

b. The GDC refused to produce most of the requested materials until mid-2023, after DOJ issued an administrative subpoena and sought and obtained court enforcement of the subpoena.

c. The GDC also severely limited DOJ's access to its prison facilities and to staff interviews until the district court entered a protective order for the documents DOJ had subpoenaed.

d. Prior to the court's entry of the protective order, the GDC restricted DOJ's access to areas of the prisons accessible to incarcerated persons and facilitated interviews with incarcerated persons but not with staff.

e. Even after GDC began to produce the requested records, the DOJ encountered challenges in gathering documents.

f. The GDC ultimately produced records sufficient for DOJ to make findings, but the agency delayed or objected to production of some of the material, including investigation records.

g. The DOJ gave the GDC an opportunity to provide records that could have clarified, corrected, or disputed information from other sources, including interviews of staff and incarcerated persons.

h. Although GDC eventually completed production of documents responsive to the DOJ's first subpoena, which was overseen by a federal court, as of the time of publication of this report, GDC still has not completed production of documents responsive to other requests, including a subsequent subpoena issued in mid-2022 for records related to each of the facilities visited by DOJ.

i. Although GDC ultimately produced over 19,000 records, the process of obtaining records and information from GDC was unnecessarily contentious and lengthy.

210.

Throughout the investigation, the DOJ also sought and obtained information from state entities other than GDC, including the Peace Officer Standards and Training Council (POST), which trains and, in some cases, investigates GDC officers; the Georgia Bureau of Investigation (GBI), which conducts some criminal investigations involving the prisons; the State Board of Pardons and Paroles, which serves as a reporting entity for sexual abuse allegations; and the Governor's Office of Planning and Budget.

211.

The DOJ also sought and obtained information from third-party sources, which included emergency response companies, local coroners, medical providers, community-based rape crisis centers, legal organizations and law firms representing people in GDC's custody or their survivors, and stakeholders such as community activists, currently and formerly incarcerated people, their loved ones, and current and former employees of GDC.

212.

Through these sources, the DOJ obtained thousands of pages of documents, some of them official GDC documents obtained by third parties via open records requests.

213.

The DOJ also conducted hundreds of interviews with stakeholders in the course of their investigation of Georgia prisons, which includes Smith State Prison.

214.

The DOJ also received more than one thousand letters, emails, and other communications from people who are currently incarcerated in Georgia prisons, as well as their loved ones and grassroots advocates.

215.

On October 1, 2024, the DOJ released its findings for its Investigation of Georgia Prisons (hereinafter referred to as "Report").

216.

In the Report, the DOJ found that the Georgia prison system fails to protect incarcerated people from violence and harm by other incarcerated people in violation of the Eighth Amendment

217.

According to the DOJ in the Report, "The State is deliberately indifferent to these unsafe conditions", and "The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them."

218.

The constitutional violations are exacerbated by serious deficiencies in staffing and supervision caused by Defendant Oliver, physical condition and security

of the facilities caused by Defendant Clark, control of weapons and other contraband, and incident reporting, response, and investigations.

219.

According to the DOJ in the Report, "The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence".

220.

According to the DOJ in the Report, "GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death".

221.

According to the DOJ in the Report, "The State continues to run its prisons as it has for years, without taking reasonable measures to change course and improve conditions".

222.

According to the DOJ in the Report, "GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls."

223.

According to the DOJ in the Report, "GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence".

224.

According to the DOJ in the Report, "GDC fails to control weapons, drugs, and other dangerous contraband in its prisons".

225.

According to the DOJ in the Report, "GDC fails to report and investigate serious incidents of harm and dangerous activities".

226.

According to the DOJ in the Report, "The State is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons".

227.

According to the DOJ in the Report, "After an extensive investigation in Georgia's prisons housing people at the medium- and close-security levels, the Department of Justice (the Department or DOJ) concludes that there is reasonable cause to believe that the State of Georgia and the Georgia Department of Corrections (GDC) violate the Eighth Amendment of the United States Constitution".

228.

According to the DOJ in the report, "GDC fails to provide incarcerated persons housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety."

229.

The DOJ's investigation identified hundreds of serious incidents that highlight the systemic violence and chaos in Georgia prisons, and Georgia's failure to control it.

230.

For example, in one month in 2023, Georgia prisons experienced five homicides at four different prisons, and serious incidents at other facilities.

231.

Violent incidents occur across the Georgia prison system, placing thousands of incarcerated people at substantial risk of serious harm on an ongoing basis.

232.

Within a span of just four days in one case in 2023, two brutal assaults occurred in the same facility, Smith State Prison, one resulting in a man's death. They include:

a. An incarcerated man at Smith was discovered dead, possibly strangled to death by his roommate in a segregated housing unit. The local coroner noted the body was badly decomposed, and the man likely had been dead for over two days.

b. Four days prior, another person was assaulted by multiple incarcerated people inside another housing unit at Smith. A video of the assault was uploaded onto social media, where the victim's family saw it several

days later. The video showed an incarcerated man sitting on the floor with his hands tied behind his back before a group of men around him punched, kicked, and stabbed him.

233.

The Georgia prison system has become a hub for known criminal activity, endangering other incarcerated persons and the public.

234.

District Attorneys from around the state told DOJ that the proportion of violent crimes originating in the prisons, including homicides, has increased in recent years, straining prosecutorial resources.

235.

In the past six years, hundreds of Georgia prison officers have been arrested on criminal charges arising out of acts committed in or in relation to the prisons, including acts with victims outside of the prisons.

236.

The vast majority were contraband-related arrests, while other charges involved violence, extortion, or sexual assault; gangs with members inside and outside the prisons often played a role.

237.

Dozens more officers have been fired, but not arrested, for misconduct related to contraband.

238.

There are more than 425 cases in which Georgia prison employees have been arrested since 2018 for crimes on the job. Some were charged with brutality, extortion or sexual assault. But most arrests — at least 360 — involved contraband. In at least 25 additional contraband cases, employees were fired but not arrested.

239.

Some of those employees were paid thousands of dollars before they were caught in schemes that went on for months and even years. Those who were prosecuted rarely faced prison time. Some weren't prosecuted at all.

240.

Some of the officers accused of wrongdoing include but are not limited to:

a. In 2021 at Rutledge State Prison, a cellphone seized from an inmate showed a series of payments to a correctional officer, Promise Tucker. When Promise Tucker was confronted by the warden in that case, Tucker admitted she would buy a can of tobacco for $40 and sell it to a prisoner for $500. A pack of Newport cigarettes, she said, could be sold for $200 to $250. When Promise Tucker was asked by the warden how long she'd been smuggling in these items, she said she'd been doing it

since she became a cadet 14 months earlier. She resigned in lieu of termination.

b. In 2019, a correctional officer at Calhoun State Prison, Temperess Johnson, was caught attempting to smuggle eight cellphones and a large haul of meth — 2.6 pounds — in a GDC van taking prisoners to medical appointments. She was due to receive $10,000, she told authorities. She was sentenced to five years in federal prison.

c. During a four-month period in 2018, Voltaire Pierre, a correctional officer at Hays State Prison, received $7,000 for bringing in pot, cocaine and meth in noodle soup containers. He was sentenced to more than eight years in federal prison.

d. Over three days in January of 2023, four employees working at four different prisons were charged in contraband cases. Among those caught: the food service director at Central State Prison, who was alleged to have concealed pot and meth inside a bag of chips

e. At Calhoun State Prison, since 2018 at least 19 employees have been caught bringing in contraband.

f. In one case in 2023, a correctional officer was sentenced to 18 months in prison after pleading guilty to her role in the massive drug trafficking network. For at least two years, the investigation found, the inmate

helped a prisoner, James Dylon NeSmith, smuggle meth into the prison and distribute it.

g. At the Georgia Diagnostic and Classification Prison, which includes the state's execution chamber, officer Vera Jackson admitted in 2018 that she was paid to provide a man on death row with information on upcoming shakedowns and on the staff.

h. At Baldwin State Prison, 22-year-old Natalian Andrews was hired as a correctional officer in 2018, though her previous work experience was as a sales associate at Walmart. Nine months later, she was fired for smuggling in a small amount of marijuana in her bra for a prisoner on his birthday.

i. Jasmine Nicole Hall had been an officer at Hancock State Prison for just seven months when, in January 2019, she was caught at the entrance with three Aquafina water bottles with the seals broken and the liquid discolored. The bottles were found to contain compartments filled with meth, pot, ecstasy and hydrocodone.

j. At Baldwin State Prison in 2021, it was discovered that Lt. Tracey Wise had been smuggling papers laced with K-2, a synthetic form of marijuana, for a notorious gang member.

241.

According to T. Wright Barksdale, a Georgia prosecutor whose district includes several prisons, "We have got a chronic, persistent issue in the state of Georgia of bad apples within the Department of Corrections doing all sorts of things. It's a problem we're dealing with every day,".

242.

Scores of people have been charged or sentenced in high-profile criminal cases arising from illegal conduct by people incarcerated by GDC or by GDC employees that has harmed people inside and outside the prisons.

243.

For example, in February 2023, the Warden of Smith State Prison, Brian Adams, was arrested on Georgia RICO charges for his alleged involvement in an extensive drug-smuggling conspiracy led by a person who was incarcerated at Smith.

244.

In one case in 2023, 23 individuals, including several individuals who were incarcerated at six different Georgia prisons, were charged in a sweeping federal indictment stemming from gang-related crimes committed from inside and outside Georgia prisons, including stabbings and assaults committed at multiple Georgia prisons in 2020; a shooting death in the outside community in Griffin, Georgia, in December 2020; and a home arson in early 2021. In a separate federal indictment the same month, a man incarcerated at Telfair State Prison received a federal

sentence of life in prison for his leadership role in a massive, gang-related drug trafficking conspiracy; a GDC CO also was sentenced in the case, for helping to move contraband into the prison at the incarcerated gang leader's direction.

245.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Smith State Prison's crumbling infrastructure, caused by Defendant Clark's maintenance practices, which inmates use to craft makeshift knives, called "shanks," for use as weapons. Such shanks were used in the Attack to harm and maim Plaintiff.

246.

Gross deficiencies in Smith State Prison's provision of medical care, caused by Defendant Oliver's understaffing exposed Plaintiff to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for at least half an hour while bleeding and did not receive constitutionally adequate medical care for a period of weeks while in solitary confinement.

247.

Violence in the Georgia prisons, which includes Smith State Prison, has reached a crisis level. Defendant Oliver and Defendant Clark are aware of this.

248.

Violent acts by incarcerated people against other incarcerated people at Georgia Prisons, which includes Smith State Prison, include homicides, stabbings, and sexual abuse. Plaintiff was a victim of stabbing.

249.

Killings, stabbings, and assaults are common at Georgia Prisons, which includes Smith State Prison. Plaintiff was a victim of assault and stabbing at Smith State Prison.

250.

Assaults and stabbings with man-made "shanks" are a feature of life at Georgia Prisons, which includes Smith State Prison. Plaintiff was stabbed with a man-made shank at the Smith State Prison.

251.

Defendant Oliver failed to take appropriate steps to provide reasonable protection from harm to the incarcerated people in custody.

252.

Those incarcerated in Georgia prisons, as well as GDC employees, faced an ongoing substantial risk of serious harm due to the lack of controls and violent conditions in Georgia's prisons, which includes Smith State Prison.

253.

At all relevant times herein, Defendant Oliver failed to provide incarcerated persons, including Plaintiff, housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety.

254.

Defendant Oliver's failure to provide adequate staffing and supervision, to maintain basic correctional operations, and to adequately deter, report, and investigate incidents has created an environment of fear and complacency.

255.

Violence, including sexual assaults, stabbings, beatings, and other brutal violence, is a systemic problem in prisons across the state, which includes Smith State Prison.

256.

As a result of Defendant Oliver's actions, staffing levels at prisons housing people at the medium-and close-security levels, which includes Smith State Prison, are inadequate to protect incarcerated people from harm.

257.

Contraband weapons, illicit drugs, and cellphones are commonplace across Georgia's prisons, which includes Smith State Prison.

258.

Defendant Oliver, the GDC commissioner, acknowledged that contraband is the "driving force" for the violence inside the state's prisons, as well as the violence that spills over into the outside world.

259.

Georgia prison officials allow frequent, pervasive violence in the prisons, including Smith State Prison, resulting in serious bodily harm and, in some cases, death.

260.

The consequences reflect systemic breakdowns in basic correctional practices, including staffing and supervision, security systems, contraband control, physical plant, and housing, which are a result of Defendant Oliver's understaffing practices and Defendant Clark's maintenance failures.

261.

A loss of control over the prisons has set in, with near-constant, life-threatening violence functioning as the norm.

262.

According to the GDC, from 2018 through 2023, 142 people have been killed in Georgia prisons, on the State's watch.

263.

According to GDC mortality reports, in 2018, there were 7 homicides systemwide; in 2019, that number jumped to 13 homicides.

264.

Since then, there have been well over 20 homicides in Georgia prisons every year, with 28 in 2020, 28 in 2021, 31 in 2022, and 35 in 2023, according to GDC data.

265.

The rate of homicides in Georgia prisons significantly exceeds the national average.

266.

The national average homicide rate in state prisons across the country for 2019 was 12 per 100,000 people.

267.

Georgia's rate in 2019 was almost triple, at 34 per 100,000 people, and the numbers of homicides have increased precipitously since then.

268.

Georgia prisons saw an unprecedented 38 homicides in 2023, topping the previous record of 31 the year before.

269.

There were at least 17 homicides at Smith State Prison between 2020 and 2023.

270.

In addition to deaths due to violence in the prisons, including Smith State Prison, other serious and life-threatening incidents are exponentially more frequent.

271.

Assaults with weapons, fights, sexual assaults, and other violent incidents are common at Georgia Prisons, including Smith State Prison.

272.

In interviews at 16 of the 17 Georgia prisons the DOJ visited in 2022 and 2023, which includes Smith State Prison, incarcerated people consistently reported that they have witnessed life-threatening violence, including stabbings, and that weapons are widespread in the prisons.

273.

While GDC incident reports document a longstanding pattern of serious violence inside the prisons, many violent incidents often go unreported when they occur in unsupervised housing units or other areas with inadequate staff supervision.

274.

Based on GDC's records, the levels of reported incidents of violence within the GDC system are consistently high.

275.

From January 2022 through April 2023, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons, which includes Smith State Prison. Of these incidents, 19.7% involved a weapon, 45.1% resulted in serious injury, and 30.5% resulted in offsite medical treatment

276.

From January 2022 through April 2023, the overall incidence of violence gradually increased across the close-security prisons and most of the medium-security prisons, which includes Smith State Prison.

277.

The numbers in the above two allegations do not capture the full scope of violence within the system because:

a. First, violent incidents are consistently underreported due to a lack of staff supervision and other factors, causing some incidents never to be reported at all

b. Second, violent incidents are often mischaracterized using inappropriate incident-type categories, resulting in under-counting of violent incidents such as assaults and fights.

278.

In 2021, the highest number of homicides at any one prison occurred at Smith State Prison.

279.

In 2023, seven incarcerated people and one CO were killed in homicides at Smith State Prison.

280.

In June 2024, an incarcerated person at Smith State Prison used a contraband gun to kill a food-service worker and then take his own life.

281.

Examples of homicides at Georgia facilities, which includes Smith State Prison, include, but are not limited to:

a. Eddie Gosier, 39; May 2, 2020, ligature strangulation. He died just hours after an inmate with a particularly violent history was moved by guards into his cell. Gosier's killer, Daniel Luke Ferguson, had previously strangled to death an inmate at Hays State Prison after being sentenced to life in prison when he was 18 for the shooting death of a neighbor in Walton County.

b. Terry Lee Bennett II, 43; Jan. 10, 2021, blunt impact to the head

c. Ali Lamont Tanner, 45; July 2, 2021, stabbed

d. William Taylor Bodge, 61; Feb. 5, 2022, delayed complications of blunt force injuries

e. Raphael Zachery Milligan, 41; July 21, 2022, blunt force injuries and strangulation

f. Joshua Emanuel Williams, 22; July 3, 2020, multiple sharp-force injuries

g. Jose Martin Ibarra Garcia, 41; June 15, 2021, multiple stab wounds to the head

h. Edward Jamar McCloud, 40; July 23, 2021, sharp-force injury to the neck

i. Jamari McClinton, 21; Aug. 11, 2021, stabbed. He was slain just five days after being transferred from Phillips State Prison, where he had been in protective custody after threats from gang members. Protection was removed when he was transferred.

j. Bedarius Clark, 26; Aug. 21, 2021, homicide. He was found unresponsive in the prison's segregation unit. The GDC described the death as an assault

k. Kion E. Parks, 31; Sept. 14, 2021, stabbed. Incident report shows five other inmates were involved in the incident.

l. Rufus Ramon Lee, 27; Dec. 14, 2021, stab wound of the chest. Incident report shows four other inmates were involved in the incident.

m. Kendall Ja'Mal Cromer, 31; Nov. 30, 2020, stab wound of the neck and chest. Incident report shows four other inmates were involved.

n. Hendricks Riley Gunn, 42; Jan. 1, 2022, blunt force injuries of head and neck

o. Douglas Anthony Forts, 57; June 2, 2022, acute traumatic amputation of finger during fight

p. Hezekiah Sha'Nard Cuyler, 21; Sept. 14, 2022, stabbing

q. Dimitri Merci Jackson, 36; Jan. 3, 2023, stab wound of the chest

r. Daniel Charriez, 46; Feb. 23, 2022, delayed complications of traumatic brain injury, four months interval

s. Boyd Henry Williams, 64; Oct. 3, 2022, manual strangulation, blunt force trauma to head

t. Raul Bailon Garcia, 39; April 21, 2020, positional asphyxia and suffocation due to assault, blunt trauma to soft tissues

u. Joctavious Artez Newsome, 25; Nov. 4, 2020, stab wound

v. Demetrius Stubbins, 38; Dec. 21, 2020, stab wound to the chest

w. Christopher Dewayne Mathis, 37; Feb. 26, 2021, blunt force trauma to head

x. Fabian Garcia-Mata, 27; Sept. 10, 2021, multiple stab wounds

y. Troy Donald Harvey, 34; Sept. 12, 2021, stab wound of the chest

z. Cesar Arnold Pastrana Morales, 33; March 13, 2020, stab wound of the chest. Incident report shows five other inmates involved in the incident.

aa. Rashad Bolton, 29; Jan. 4, 2021, puncture wound to the chest with sharp object

bb. Dwayne Zackery Jr., 22; Feb. 12, 2021, stab wound to the chest with homemade knife

cc. Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report shows five other inmates directly involved. A lawsuit alleges he was placed in a dorm with known gang members who were hostile to LGBTQ inmates.

dd. Terry Lee Bishop, 49; Oct. 18, 2022, blunt force trauma, acute toxicity of methamphetamine, acute toxicity of cannabinoids

ee. Anthony L. McGhee Jr., 34; March 29, 2020, complications of blunt-force head trauma and sharp-force trauma of torso and extremities

ff. Jorge Renberto Ventura-Cabrera, 35; June 5, 2021, stab wounds of neck, torso and upper extremities. Incident report shows two other inmates involved.

gg. Quintez Smith, 25; Aug. 29, 2022, multiple sharp-force injuries

hh. Jerry Lee Brown, 61; Nov. 12, 2020, stab wounds to the head, blunt-force injury to face

ii. David Lamar Henegar, 44; Oct. 16, 2021, manual strangulation and blunt-force injuries of the head, torso and extremities

jj. Angela Anderson, 39; Sept. 11, 2022, asphyxia due to neck and chest compression

kk. Johnny Eugene Young, 24; Jan. 27, 2020, sharp-force injury of mouth/tongue

ll. Rafael Blas Becerra, 36; March 7, 2020, stab wounds to the upper torso. Incident report shows seven other inmates involved, with six injured.

mm. Carrington Juwon Frye, 23; March 20, 2020, stab wounds of the neck and chest. Incident report shows two other inmates involved.

nn. David Travis Alexander Dennis, 35; May 13, 2020, multiple sharp-force injuries

oo. Coty Dustin Silvers, 39; May 23, 2020, asphyxia

pp. Bobby Edward Lee Jr., 38; July 13, 2020, ligature strangulation. A federal lawsuit alleges he died from gang violence, understaffing, and indifference by prison officials.

qq. Robbie B. Brower, 58; Oct. 4, 2020, blunt and sharp-force injuries to the head and neck

rr. Raul Villegas, 37; Dec. 13, 2020, stab wound to the torso. Incident report shows three other inmates involved.

ss. Carlos Maurice Fisher Jr., 30; May 10, 2021, multiple sharp-force injuries

tt. Ryan Weston Darville, 37; Dec. 29, 2021, stab wounds of the chest

uu. Joseph Walter Brown, 36; July 26, 2022, multiple stab wounds

vv. Dan Brooks, 50; Aug. 21, 2022, stab wound of the neck

ww. Kendrick Malik Brown, 25; Oct. 16, 2022, blunt-force head injury

xx. James Cornelius McLeroy III, 26; Dec. 19, 2022, stab wounds of the torso

yy. Norman Samples, 59; Dec. 27, 2022, blunt force injuries of the head and torso

zz. Dave Stone, 61; Nov. 20, 2021, closed head trauma, delayed effects

aaa. Jamal Cymonne Johnson, 32; June 11, 2022, stab wounds of the head

bbb. Sidney Sanchez Nealey, 22; July 18, 2022, stab wounds of the torso

ccc. Jacob Kendall Daniels, 18; Aug. 13, 2022, stab wound of the neck, shoulder and arm

ddd. Quafabian Melik McBride, 19; Sept. 30, 2022, stab wound of chest, injuring heart; sharp-force injuries of head, torso and upper extremities. Stabbing occurred during a gang-related fight in the lockdown unit. McBride was housed elsewhere in the prison and had been brought to lockdown that day through the arrangements of officers.

eee. Alim Rasheed Lovett, 33; Dec. 8, 2022, stab wounds of the back, injuring right lung. Also sharp-force injuries of the head, torso and right thigh. Incident report shows four other offenders involved.

fff. Curtis Mincey, 74; July 22, 2021, blunt-force trauma of the head, neck, torso and extremities

ggg. Taylor Harrison Brooks, 26; April 10, 2020, multiple stab wounds

hhh. John Bretleir Reyes Cardona, 24; April 20, 2020, exsanguination (severe loss of blood) from stab wound to neck

iii. Justin Nathaniel Wilkerson, 25; Jan. 5, 2021, asphyxia, neck compression

jjj. Desmond Hill, 35; April 9, 2021, strangulation

kkk. Hiwatha Abdulcah Hakeem Jr., 26; April 12, 2021, multiple stab wounds. Incident report shows four other offenders involved.

lll. Derrick Dionte Deshun Harvey, 26; June 25, 2021, stab wound to the chest

mmm. Christopher Ray Reynolds, 38; July 1, 2021, blunt- and sharp-force injuries of the head and neck

nnn. Christopher Michael Redwine, 45; Sept. 27, 2021, asphyxia due to manual strangulation

ooo. Nathan Michael Mahan, 37; Oct. 23, 2022, stab wounds

ppp. Randy O'Neal Wynn, 54; March 1, 2023, homicide. Lawsuit alleges supervisory liability claims against Smith State Prison and GDC officials.

qqq. Cedric La'Troy Johnson Sr., 35; March 13, 2020, strangulation

rrr. Aldrich Norval Cain, 26; April 23, 2020, multiple stab wounds. Incident report shows four other inmates involved.

sss. Marcus Derrelle Pearson Jr., 28; May 29, 2020, multiple stab wounds. Incident report shows two other inmates involved.

ttt. Luis Garcia Palacio, 41; July 28, 2020, blunt impact injuries of the head

uuu. Juan Carlos Arguelles-Reveles, 37; May 7, 2021, stabbing. Incident report shows 11 other inmates involved.

vvv. Xavier LaMar Warren, 32; Dec. 28, 2022, stab wound of the torso. Incident report shows four other inmates involved.

www. Logan Todd Peterson, 27; Dec. 27, 2021, post-traumatic subarachnoid hemorrhage (bleeding in the space around the brain), assault

xxx. Prince Leonard Blige, 54; Feb. 12, 2020, stab wound to torso

yyy. Orvonta Tillman, 36; June 16, 2020, multiple sharp-force penetrating trauma to thorax

zzz. Bobby Carpenter, 31; Sept. 9, 2020, stab wound to the chest

aaaa. Hakeem Olajuwon Williams, 27; Feb. 28, 2022, stab wound to the chest

bbbb. Dexter Jarrod Burnett, 35; Sept. 16, 2022, stab wound of the torso

cccc. Robert Lee Wilson III, 31; July 17, 2020, multiple stab wounds. Incident report shows 16 other inmates involved, seven of whom were injured.

dddd. Christopher Arnett Rawls, 32; Sept. 5, 2020, strangulation

eeee. Christopher Eli Gresham, 39; Sept. 30, 2021, stab wounds of back and lower extremities. A Sept. 30, 2021, incident report of a homicide says three other inmates were involved.

ffff. Kyle Anthony Strother, 31; June 5, 2022, stab wound of the chest

gggg. Va'Darian LaVianta Carr, 26; Sept. 18, 2022, stab wound of the chest and back

hhhh. Marquis Reshawn Jefferson, 26; May 12, 2022, stab wounds of torso and arm. A May 11, 2022, incident report of a homicide says four other inmates were involved.

iiii. DaQuavious Cachone Lackey, 21; May 16, 2022, stab wound of the neck and multiple blunt-force injuries

jjjj. Michael Lee Jackson, 60; Aug. 17, 2022, multiple blunt-force injuries in the setting of hypertensive cardiovascular disease. Incident report shows two other inmates were involved.

kkkk. James Forest Williams, 43; Oct. 3, 2022, blunt and sharp force injuries of head, torso and extremities

llll. Amos Bennett Huff Jr., 60; March, 2023, strangled

mmmm. Sabino Carlos Ramos, 34; March, 2023, multiple stab wounds

nnnn. Arthur James Wimbush Jr., 46; April 2, 2023. Blunt-force trauma with fracture of thyroid cartilage

oooo. Anthony Zino, 71; April 5, 2023, asphyxia, neck compression inflicted by other

pppp. LaParrish Dawayne London, 30; March 21, 2023, stab wound of the chest

282.

In 2020, there was a major riot at Ware State prison, in which incarcerated persons obtained facility keys, let scores of other incarcerated persons out of their housing units, held officers hostage and stabbed officers, set fires inside a housing unit office and burned a GDC transport cart, and broke into an office and obtained officers' weapons and defensive gear. The riot resulted in several hospital transports, including four officers, one via helicopter life-flight.

283.

In October 2020, at Georgia State Prison, an incarcerated man was taken to the hospital by ambulance for a cut to his forehead and dark ligature marks around his neck. (Hereinafter referred to as "2020 GA SP Incident")

284.

In the 2020 GA SP Incident, the incarcerated man reported that his bunkmate had tried to kill him by wrapping a sheet around his neck. Less than five months later, an ambulance returned to GSP to pick up the same man. This time, he had yellow and purple bruising on the entire right side of his face, a deformity indicating a possible jaw fracture and multiple human bite marks all over his body.

285.

In the 2020 GA SP Incident the man was so malnourished that every bone in his spine was bruised. He reported that he had been kicked in the face, people had

been stealing his food for months, his bunkmate had been sexually assaulting and raping him, and nobody was helping him

286.

On August 3, 2020, an officer at Phillips State Prison was conducting rounds in a housing unit when an incarcerated person handed him a note stating that an incarcerated person in another cell had been held hostage for days, was yelling for help, and might be injured. In May 2023, DOJ interviewed the victim, who reported that he had been held and tortured for almost four days, he had been stabbed from behind and his eye was pierced and he suffered a traumatic brain injury.

287.

Almost exactly a year later from the incident in the above allegation, on August 12, 2021, the same assailant assaulted another incarcerated person at the same prison; the victim of the second assault required outside medical treatment at a hospital.

288.

At Smith State Prison, in May 2020, GDC staff informed emergency services responders that an incarcerated person had been tied up, beaten, and waterboarded by his cellmate. (hereinafter referred to as "2020 Smith Incident")

289.

In the 2020 Smith Incident, the cellmate also inserted multiple bars of soap into the victim's rectum. One bar of soap, covered in stool and blood, had already fallen out. The victim suffered multiple contusions to his face and chest and was bleeding heavily from his nose and mouth. He had ligature marks on his neck and still had makeshift binding around his wrist. He was transported to a local hospital; while he was being moved to an emergency-room bed, two more bars of soap fell out of his rectum. The hospital found that most of his upper teeth had been broken during the assault. One hundred-fifty milliliters of blood was suctioned from his airway.

290.

On May 22, 2022, at Hancock Prison, an incarcerated person was severely injured while attempting to stop an assault on another inmate

291.

Defendant Oliver's grossly inadequate staffing of prisons, including Smith State Prison, leaves incarcerated persons unsupervised and hampers staff's ability to respond to violence. This occurred in Plaintiff's case and led to Plaintiff's injuries.

292.

Incarcerated people in custody at Georgia prisons, including Plaintiff, were put at substantial risks of serious harm due to severe understaffing in Georgia prisons caused by Defendant Oliver's actions.

293.

In the past several years, staffing in Georgia prisons has been too low to provide reasonable supervision. Vacancies and turnover are high, especially among security staff who are directly responsible for supervising incarcerated persons.

294.

Defendant Oliver has failed to improve the dire staffing problems at Georgia's prisons.

295.

Maintaining adequate staffing levels and ensuring supervision of the population are critical components of a safe and secure prison facility, particularly protection from harm including from violence.

296.

GDC leadership has long presided over a system with severe staffing shortages, with systemwide CO vacancy rates over 50% since mid-2021 – too low to operate reasonably safe and functional facilities.

297.

Beginning in the mid-2010's, a downward trend in staffing numbers already had begun.

298.

From 2014 to 2018, annual average CO vacancy rate at Georgia prisons climbed from almost 11% to over 18%.

299.

Between 2018 and 2023, Georgia prison staffing levels fell precipitously, reaching a systemwide CO vacancy rate of 60% in April 2023, with over 2,800 vacant officer positions. Plaintiff was attacked in this very month as a result of these staffing issues.

300.

Moreover, Georgia's most violent prisons, which includes Smith State Prison, have much higher staff vacancy rates than the systemwide average.

301.

In April 2023, the vacancy rate was over 60% at 20 medium-and close-security prisons; twelve of these prisons had vacancy rates above 70%. Plaintiff was attacked in this very month as a result of these staffing issues.

302.

By the end of 2023, CO vacancy rates remained in the same range at Georgia's most dangerous prisons.

303.

In December 2023, the vacancy rate was over 60% at 18 medium-and close-security prisons; ten of these prisons had vacancy rates above 70%.

304.

The reality of these high vacancy rates is that Georgia was operating most of its close- and medium-security prisons with more officer posts vacant than filled, resulting in inadequate security and supervision.

305.

Between October 2022 and the end of 2023, more than 15 state prisons housing individuals at the medium- and close-security levels saw a net loss in filled CO positions, while several others saw increases only in the single digits.

306.

In interviews with DOJ in 2023, staff at large men's prisons housing incarcerated people at the close-security level reported that high CO vacancy rates over 60%, as well as significant vacancies among supervisory security staff persisted.

307.

GDC's Human Resources Director acknowledged that GDC still "lag[s] behind in the salary market," so pay remains "a factor."

308.

In employee morale surveys conducted at several facilities in 2023, employees cited as the "worst" aspects of their jobs or as the "biggest challenges" facing GDC,

factors including "retaining quality staff," "staff morale," "work environment," and the "safety and security of facilities."

309.

With a systemwide CO vacancy rate over 50%, Defendant Oliver did not staff the most critical posts or conduct other basic correctional operations in GDC prisons, including Smith State Prison.

310.

According to GDC policy, for a prison to maintain normal operations, allotted posts at the Priority 1, 2, and 3 levels must be filled; of these, Priority 1 posts are considered critical.

311.

For example, at the prisons that house incarcerated persons at the medium- and close-security levels, it is generally required that each housing unit be staffed by two or more officers in 24/7 Priority 1 (or otherwise designated as mandatory) posts, with additional Priority 1 posts assigned around the facility, including those stationed at the front entrance and patrolling the perimeter.

312.

According to the GDC, all incarcerated persons classified as close security – over 11,000 incarcerated people, about 23% of GDC's total population – always require supervision by a CO.

313.

Yet GDC leadership and facility staff acknowledged to the DOJ, and the DOJ's review of staffing documents confirms, that, at several prisons, Priority 1 posts are consistently and frequently vacant, leaving officers unable to conduct required rounds and other duties, let alone directly supervise the population.

314.

Facility staffing records document deviations from mandatory staffing requirements, acknowledging that, due to CO staffing shortages, the minimum requirement of CO coverage cannot be met, and that sergeants and unit managers need to assist with basic housing unit coverage.

315.

In practice, however, Georgia prisons do not have enough staff, even including supervisory staff, to cover its Priority 1 posts at many of the prisons the DOJ visited.

316.

Properly conducted well-being checks, referred to as "security rounds" in the prison, are critical to the safety and security of people incarcerated at the prison.

317.

Properly conducted security rounds cannot be effectuated with the dire understaffing problems which occur at Georgia prisons, including Smith State Prison.

318.

During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

319.

With the severe understaffing at Georgia prisons, officers are unable to verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

320.

Defendant Oliver is aware of chronic short staffing in the prison system but has failed to correct it.

321.

GDC documents and the DOJ's interviews with prison staff illustrate the staffing triage that has become common across the system.

322.

Staff at several Georgia prisons have adopted a practice of assigning one CO to single-handedly supervise two buildings at a time, each comprising two or more housing units and hundreds of incarcerated people, for an entire 12-hour shift.

323.

At a large close-security men's prison known for gang problems and violence, a sampling of staffing rosters from day and night, weekday, and weekend shifts in mid-2023 confirmed that the prison is consistently staffed with well under half the security staff needed to ensure coverage of Priority 1 posts.

324.

On every shift roster the DOJ reviewed at that large close-security men's prison known for gang problems and violence, there was at least one, and sometimes up to four, officers assigned to two buildings at a time; in other words, each of those officers was single-handedly responsible for nearly 400 beds.

325.

The Regional Director responsible for the large close-security men's prison known for gang problems and violence acknowledged that, in practice, the staff assigned to multiple posts are required to switch posts every 30 minutes to check on incarcerated persons in multiple buildings, leaving units and entire buildings unsupervised during those times.

326.

At another large men's prison, a sampling of staffing rosters from 2023 showed that facility leadership consistently assigned officers to cover multiple housing units on the same shift, and that on some shifts supervisory security staff were assigned to cover officer posts in housing units.

327.

A medical employee who worked at the other large men's prison reported there have been times when only two officers were available to cover the entire compound. At times, this employee reported, the perimeter officer would need to vacate the perimeter post to cover security posts inside the facility.

328.

A shift supervisor at a large medium-security men's prison, whom the DOJ interviewed in mid-2023, reported that in a given month, there is unlikely to be a single day on which each building in the prison is covered by at least one officer.

329.

GDC's investigations make clear that staffing shortages place security staff in an untenable position and have contributed to homicides and other serious assaults.

330.

For example, an investigation of a homicide at a GDC men's prison in 2021 found that no staff checks had been done after 9:20 p.m. the night before the death; the body was found the next morning around 9:00 a.m.

331.

In 2022, at a close-security men's prison, an incarcerated man was killed after being assaulted while handcuffed. The investigation found that the officer on duty was single-handedly supervising a control center as well as both sides of the housing unit building where the homicide took place.

332.

Other incidents reveal that when security staff is stretched this thin, incarcerated people are at greater risk of harm.

333.

During DOJ's 17 facility site inspections, the DOJ's experts observed GDC's short staffing in person.

334.

While the DOJ's teams were accompanied by several Special Operations officers brought in to facilitate the DOJ's visits, generally a smaller number of facility-based staff were present.

335.

It was not uncommon on the DOJ's tours for the GDC to temporarily assign dozens of Special Operations staff to the facility, to allow the DOJ's group to tour the facility and to facilitate incarcerated people's movement to participate in interviews with DOJ.

336.

The GDC insisted on setting all of DOJ's site visits several weeks or months in advance to facilitate preparations and repeatedly informed the DOJ that its group could not split up while on-site, due to the security challenges multiple escorts would pose.

337.

As a result, the GDC did not permit DOJ to tour spontaneously and observe normal operations in the prisons.

338.

However, the DOJ still observed evidence of inadequate staff supervision.

339.

For example, in most of the 17 prisons the DOJ toured, the DOJ's experts repeatedly noted that control centers in housing units appeared to be unmanned and found little evidence that they were consistently occupied (e.g., officers' personal belongings, computer equipment such as a mouse or working monitor).

340.

Similarly, GDC records confirmed that, day-to-day, across the close-and medium-security prisons, staffing shortages were a constant challenge for the officers who are working.

341.

The security staff tasked with running a prison with insufficient backup are forced to cut corners on important prison functions including rounds and wellness checks, as well as proper documentation and recordkeeping.

342.

For example, in a sampling of internal GDC audits from 2023, in 12 out of 13 prison audits, staff failed to properly document required 30-minute cell checks in segregated housing units, with auditors noting that there were lengthy periods of time with no documented checks, or evidence that the checks had been documented before or after the fact, instead of contemporaneously.

343.

As a result of the understaffing caused by Defendant Oliver, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents.

344.

Defendant Oliver is aware of the violence in the prison. Yet he has failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts which continue at dangerous levels. Such led directly to the Attack on Plaintiff.

345.

Georgia prisons, due to the supervision, direction, and custom of Defendant Oliver, regularly operates without enough security staff to provide appropriate supervision and prevent violence. These failures led to the Attack on Plaintiff.

346.

Inadequate supervision and staffing by Defendant Oliver puts incarcerated people at substantial risk of serious harm from violence and can violate their constitutional rights, especially when other conditions like easy access to weapons contribute to the danger.

347.

Without adequate supervision, incarcerated people are at greater risk of violence and other harm due to unchecked gang activity, assaults, extortion, and access to weapons and drugs.

348.

Not only do Georgia prisons fail to adequately staff its prisons, but they also fail to take reasonable steps to mitigate its staffing shortages.

349.

One way to attempt to mitigate the danger posed by housing units with minimal or infrequent officer presence on the ground is to monitor video in the housing units.

350.

Yet at multiple facilities, security and leadership staff reported to the DOJ that surveillance video in the housing units is not monitored in the housing unit control centers or from central control.

351.

While the warden generally has access to housing-unit surveillance video, the shift supervisor and lower-level security staff do not.

352.

The result of these practices is that nobody is supervising the population in real time.

353.

Defendant Oliver's consistent failure to ensure that even minimum staffing levels are met leads to unsafe prisons.

354.

With housing units left unsupervised for sustained periods of time, incarcerated persons can engage in illicit activities, including exchanging contraband, abusing drugs, making homemade weapons, fetching contraband via drone drops, and engaging in violent assaults. Such occurred in Plaintiff's case.

355.

Gangs and other threat groups tend to step in to fill the void in leadership, telling people where they can or can't sleep and exerting control over prison life.

356.

When security staff are not present to report incidents, perpetrators may not be held accountable and can continue to cause harm to others.

357.

Appropriate follow-up, such as reassigning someone to another housing unit for protection or reclassifying someone who perpetrated an assault, may not occur.

358.

Defendant Oliver's failure to ensure staff presence, supervision, and enforcement of rules and policy in the Georgia prisons contributes to an unsafe environment.

359.

Efforts to enforce prison rules and ensure incarcerated people are where they are supposed to be also falter without adequate staff.

360.

In hundreds of interviews, incarcerated persons reported to DOJ that officers and other staff are in the housing units infrequently and that housing units and entire buildings often are completely unsupervised.

361.

This results in the proliferation of contraband and violence, as well as other rule violations that impede orderly and safe correctional operations.

362.

For example, incarcerated persons and staff consistently reported that it is common for incarcerated persons to sleep in beds other than those to which they are assigned, often because other incarcerated persons who have more power in the housing units tell people where to sleep, and officers do not notice or fail to correct the relocation. This practice illustrates how GDC staff are not in control of the population.

363.

In the event of an emergency, without adequate staffing, the ability to respond in a timely manner is severely hindered. If an assault or other violent or medically urgent incident occurs while staff are not present, the delivery of critical medical treatment to the injured person or persons may be significantly delayed.

364.

For example, in 2023, an incarcerated man at a large men's prison died after he was badly injured in a fight with another incarcerated person in a housing unit. A supervisory member of the medical staff recounted that a nurse who responded to the incident was "distraught" after the man died, because, in the immediate aftermath of the assault, medical personnel were not permitted to enter the housing unit due to insufficient security staff to escort them.

365.

As another example, in 2023, Inmate Randy Wynn was killed by his cellmate overnight at Smith State Prison, and he remained undiscovered by staff until the morning. Furthermore, once discovered, it took hours to take his barely alive body to the hospital.

366.

Conditions in Georgia Prisons, which include Smith State prison, obstruct the delivery of medical care.

367.

Security and staffing problems, caused by Defendant Oliver, affect all aspects of healthcare in the prison system.

368.

Many medical care issues stem from Defendant Oliver's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

369.

Constitutionally inadequate medical care already has led to serious injury and death, and it continues to pose a substantial risk of serious harm to people incarcerated in Georgia prisons.

370.

GDC records and EMS reports demonstrate how understaffing causes avoidable delays in providing medical care in emergencies.

371.

For example, GDC records on four deaths of incarcerated persons in 2021 describe bodies that were discovered by staff after the onset of rigor mortis, indicating that hours had likely passed since the individual had died.

372.

In interviews with DOJ, multiple EMS directors identified delays in reaching patients in the prisons, which were apparently due to GDC staffing inadequacies.

373.

The EMS director also said that overnight staffing appears to be a significant issue, noting that there have been instances where it appeared that an emergency had occurred during the night shift, but prison staff had not requested EMS until the next day.

374.

The EMS director also described difficulties in obtaining security escorts for EMS hospital transports due to security staff shortages. Such applies as well to non-emergent medical transports.

375.

Numerous incidents from across the system highlight how understaffing has contributed to delays in necessary medical care reaching incarcerated persons who have been harmed in violent incidents.

376.

For example, in June 2022, emergency services responded to Coastal State Prison for an unresponsive person. When they arrived, after some delay, they were taken to a cell where an incarcerated man lay dead on the ground. The body had rigor mortis, and was "pale and cool to the touch." GDC staff informed emergency responders that the man was in rigor when they got to him and that they found a syringe near his bed. The cause of death was an overdose

377.

On August 20, 2021, emergency services responded to Georgia State Prison for a stab wound. An incarcerated person reported that he was hog tied all night, stabbed, and then released in the morning after being tied up for over eight hours. Emergency responders noted indentations on the incarcerated person's arms and legs where he was tied. He was airlifted to a hospital.

378.

On December 8, 2020, emergency services responded to Georgia State Prison for an incarcerated person suffering burns to 90% or more of his body. The incarcerated person reported that he was using the phone, laid it down onto the metal flap of his door, and then it caught fire. The fire ignited his clothes and then burned his body. Emergency responders observed burns on his chest, abdomen, back, armpits, left hand, groin, penis, testicles, buttocks, legs, and feet. The man was in

extreme pain. Staff reported that the incident was suspected to have happened around 4:00 p.m. to 5:00 p.m., but the incarcerated person was not brought to the medical unit until around 10:24 p.m., just prior to calling emergency services. Transport to the hospital was delayed because prison security staff did not have an officer ready to go. The incarcerated person was eventually airlifted to a hospital.

379.

An incarcerated person was stabbed multiple times on May 23, 2022, at Ware State Prison. There was no security staff in the dorm, so other incarcerated people beat on the window to draw the attention of staff. It took half an hour for someone to respond. The victim was taken to the hospital, where he was diagnosed with a collapsed lung from a stab wound. After five days in the hospital, he returned to Ware and was locked down in isolation. He was never interviewed about the incident.

380.

Understaffing also can lead to infrequent security and wellness checks and failures to properly document security rounds and other central functions of correctional security staff.

381.

GDC's internal facility audits confirm serious failures in security-related documentation and recordkeeping in multiple operational components that directly affect safety.

382.

For example, the audits found evidence that supervisors had cleared counts despite discrepancies, and that count packets, count slips, and other documentation related to counts were inaccurate.

383.

The 2023 facility audits also identified delays in submitting incident reports; inaccuracies and discrepancies in documentation related to contraband control; incomplete documentation and logs for visitor records and facility entry; inconsistent implementation of required checks and documentation thereof in segregated housing areas; failure to maintain appropriate lists and other records of chemicals, tools, and other materials that could be used for illicit purposes; and inadequate inspection procedures, resulting in irregular performance of required tests.

384.

The audits also indicate that wellness checks are not conducted as required by policy.

385.

For example, 2023 internal compliance audits of operations in segregated housing units in several GDC prisons found evidence of improper documentation of thirty-minute checks in administrative segregation: instead of documenting thirty-minute checks next to each cell door when they occur as required for the safety of individuals in these units, officers likely had back-filled the check logs at the end of a shift.

386.

Adequate security staffing and supervision are essential to a minimally safe and secure prison. Defendant Oliver's failure to ensure adequate staffing in the prisons contributes to harm from violence and to unsafe facilities across the state.

387.

Georgia prisons are unsafe due to aging and inadequately maintained facilities. Defendant Clark through his supervision, failed to maintain Georgia prisons, including Smith State Prison.

388.

Adequate preventive maintenance are essential components of prison security.

389.

Damage to facility hardware and infrastructure poses risks to incarcerated persons' physical safety, as furniture and fixtures can be dismantled to make weapons, holes in ceilings and walls can be used to gain access to unauthorized areas

or to hide contraband, and dilapidated and unsanitary conditions can lead to internal tension. Such led to the Attack of Plaintiff.

390.

Defendant Clark failed to maintain Georgia prisons, including Smith State Prison, in reasonably safe and secure conditions, placing incarcerated people and others inside and outside the facilities at unacceptable risk.

391.

GDC's internal facility audits, as well as information DOJ obtained from facility site inspections and interviews with staff and incarcerated people, establish that GDC does not take the steps necessary to maintain secure prisons, including timely preventive and corrective maintenance.

392.

Leadership has acknowledged that aging facilities raise challenges across the system, with the average GDC prison over 30 years old and reaching "end of life," according to a recent public presentation by the Commissioner.

393.

Poor maintenance and pervasive contraband, caused by the supervision, direction, custom, and policy of Defendant Clark and Defendant Oliver, contribute to the violence at Georgia prisons, including the violence that Plaintiff was a victim of during the Attack.

394.

Defendant Clark and Defendant Oliver were aware of the danger these conditions pose to incarcerated people but have failed to take adequate action to make the facility safe.

395.

Unmaintained parts of Georgia prisons, caused by the supervision, custom, and policy of Defendant Clark and Defendant Oliver jeopardize inmate safety and provided the makeshift weapons for the Attack onto Plaintiff.

396.

Due to poor maintenance by Defendant Clark, Georgia prisons are a source of dangerous weapons and expose people to violence.

397.

Frequently, Georgia prisons, through the leadership of Defendant Clark, fail to promptly fix things that break in its facilities – even when the thing that is broken is as central to prison operations as a lock or key.

398.

A 2023 GDC facility audit found that staff failed to submit maintenance requests for broken keys.

399.

Staff at the same prison explained in an interview with DOJ that the officer designated to perform lock-and-key duties is frequently pulled from that assignment to cover security posts, and therefore is unable to maintain the lock-and key system at the prison.

400.

Additionally, Georgia prisons, as a result of the understaffing by Defendant Oliver, does not have sufficient security and maintenance staff to maintain facilities after fixing broken fixtures, windows, walls, ceilings, and other components of facilities.

401.

The DOJ was told repeatedly by incarcerated people, including those who work maintenance details and are responsible for facility repairs, and some staff that an enormous amount of repair work was undertaken prior to DOJ's site visits to each prison. Despite these efforts, during site visits, the DOJ's experts observed physical building and maintenance issues that affect security, including broken or exposed electrical outlets and wiring, metal fixtures, large holes or patched areas in ceilings and walls, and small holes and cracks in walls and windows.

402.

Georgia prisons, under the leadership of Defendant Clark, also fail to comply with their own policies to regularly evaluate, test, and document the condition of its security infrastructure and systems.

403.

Internal audits confirm that Georgia prisons fail to take necessary steps to ensure its prisons are secure.

404.

For example, several 2023 facility audits found that Georgia prisons fail to perform required checks of windows and doors to ensure they have not been cut or modified.

405.

Several facility audits also found that Georgia prisons fail to maintain accurate key and tool inventories and to document key counts and checks.

406.

For example, one 2023 facility audit of a close-security men's prison noted inconsistencies in accounting for and inventorying tools, and a lack of consistent control and documentation regarding chemical agents, weapons, and inventory.

407.

Defendant Clark's failure to maintain control of such sensitive equipment as keys and tools exposes the population (and staff) to an unreasonable risk of harm,

because discrepancies and failures to follow policies in these areas can compromise the physical security of the facilities' doors and gates and can facilitate the use of weapons and other contraband.

408.

Georgia prisons fail to control weapons, drugs, and other dangerous contraband in its prisons.

409.

Georgia prison contraband controls fail to address the scope and complexity of the problem of contraband in the prisons, particularly weapons, illicit drugs, and unauthorized electronics (e.g., cellphones).

410.

Inadequate staffing and supervision, caused by Defendant Oliver, combined with ready access to contraband sources, allow incarcerated people to easily purchase, manufacture, possess, openly display, and use weapons, cellphones, and drugs.

411.

As a result, the volume of contraband in the prisons remains high, and the existence of weapons cellphones, and drugs, and the marketplace surrounding these items, places incarcerated persons at risk.

412.

Between November 2021 and August 2023, Georgia prisons recovered 27,425 weapons, 12,483 cellphones, and 2,016 illegal drug items; during the same time period, GDC documented 262 drone sightings and 346 fence-line throw overs.

413.

GDC officials acknowledged that the agency's problems with contraband are extensive in scope and that the prevalence of contraband places the population at risk.

414.

Contraband can be smuggled into prisons in various ways; staff have been caught bringing contraband in through standard entry points, throw packages of contraband over exterior fences or using remote-controlled aerial devices to perform "drone drops".

415.

Contraband weapons can be smuggled in, or, given the opportunity, incarcerated persons can make "shanks" – homemade knives – and other weapons by dismantling and sharpening metal objects and other materials found inside the prisons.

416.

Serious deficiencies in day-to-day prison operations contribute to the ongoing prevalence of contraband.

417.

At the most basic level, prison staff are not conducting routine, day-today searches of individuals and areas.

418.

Searches should include routine and surprise searches of housing units, random pat-downs of incarcerated persons moving between areas, and careful inspections for physical security breaches.

419.

Searches also should be sufficiently thorough to identify and remove contraband from searched areas.

420.

GDC's own policies require such safeguards, but in practice facility staff do not comply with the policies with the consistency required to address the problem.

421.

However, without adequate staffing, searches cannot occur as needed in Georgia prisons.

422.

In 2023, GDC internal audits of several prisons found inadequate or incomplete facility-wide searches, failures in reporting procedures for incidents

involving contraband, incomplete documentation of searches, irregular handling of discovered contraband, and inconsistency in inspecting packages for contraband.

423.

GDC policy requires regular full prison searches; the audits indicate that such searches and inspections are not conducted as frequently as required by policy, and are not taking place regularly or according to appropriate procedures.

424.

After a major incident, or as part of a special operation, GDC may call in a tactical team to conduct a search, but afterwards, staff go back to their regular practices. The lack of routine attention to security searches is a serious flaw. The types of searches the State publicizes are too infrequent and belated for a problem of such scope.

425.

GDC's staffing, supervision, and management deficiencies caused by Defendant Oliver, contribute to the failure to adequately control contraband.

426.

Georgia prisons do not have the number of staff needed to implement a system of regular searches and security checks.

427.

With large portions of the population unsupervised for long periods of time, incarcerated people have opportunities to make weapons, abuse drugs, and engage in a black market for contraband.

428.

Additionally, the DOJ review of staffing rosters and interviews with prison staff showed that officers working perimeter posts are sometimes assigned to other Priority 1 posts on the same shift, or fully re-assigned to interior duties for periods of time or entire shifts, leaving the perimeter more vulnerable to contraband introduction.

429.

The severe staffing shortages also contribute to staff vulnerability to criminal schemes involving incarcerated persons and STGs; Georgia prisons routinely places staff in stressful, challenging environments without sufficient support from other officers and supervisors.

430.

For years, the State has wrestled with staff corruption related to contraband.

431.

Hundreds of employees have been arrested, including the warden of Smith State Prison in 2023, for crimes related to contraband.

432.

The DOJ also identified problems with employee background-check and screening processes in GDC employee personnel files.

433.

For example, concerns about criminal histories, financial problems, and possibly gang-affiliated associates were identified in the background-check process, but the individual had been hired without any documentation in their file of mitigating circumstances or why their hiring was appropriate despite the identified concerns.

434.

Because housing units in prisons across the system often are completely unsupervised, violent incidents and other incidents, such as property destruction and illicit drug use, occur without any staff observation.

435.

Defendant Oliver and Defendant Clark have been aware, for a long time, of the violence in Georgia's prisons, and of the operational and management problems that contribute to the high levels of violence, including chronic understaffing, and easily accessible contraband.

436.

Defendant Oliver and Defendant Clark have been aware, for a long time, that Georgia prisons had staffing issues and a growing incarcerated population that, if not properly addressed, would lead to a crisis.

437.

Adequate staffing is critical to providing essential supervision and security in prisons.

438.

As early as 1985, the GDC Commissioner represented that there were not enough COs and that salaries were too low.

439.

In 1999, officials at the GDC again noted the mounting issue: "While the number of GDC employees remains steady, the total number of offenders continues to rise."

440.

By 2006, GDC's annual report acknowledged staffing had continued to decline: Staffing numbers are lower today than they were in 1999, even though the population has increased by around 12,300 people, or 31%.

441.

In 2019, officials at the GDC emphasized that, "Retention of Correctional Officers (COs) continues to be a challenge" and "[b]etween FY 2017 and FY 2019, CO turnover increased from 27.2% to 42.1%."

442.

While there have been some fluctuations over the years, for several years officials at the GDC have failed to hire and retain enough staff to keep the population safe.

443.

Several recent lawsuits against officials at Georgia prisons have alleged constitutional violations, including failure to protect incarcerated people from harm.

444.

Reportedly, the GDC has spent almost $20 million since 2018 to settle claims involving death or injury to people incarcerated in its prisons.

445.

In 2023, the GDC settled a lawsuit brought by an incarcerated man's family, after he was strangled to death by his cellmate at Macon State Prison in 2020, a consequence, the family alleged, of GDC's deliberate indifference.

446.

In a state-court lawsuit against GDC, GDC's former medical contractor alleged in its pleadings that GDC's failure to control violence in the prisons led to extraordinarily high medical costs for trauma care.

447.

Defendant Oliver and Defendant Clark are aware of the facts in the above allegations.

448.

Moreover, Defendant Oliver and Defendant Clark are aware, through GDC data, that violence and threats of violence are widespread in the prisons.

449.

GDC leadership officials, such as Defendant Oliver and Defendant Clark are sent a selected portion of the data that facilities collect in incident reports and other documentation.

450.

For each facility, a monthly report containing statistics, including those related to violent incidents, is generated for review by the warden and regional manager. Defendant Oliver and Defendant Clark read over these reports.

451.

Defendant Oliver and Defendant Clark receive reports of emergencies and serious incidents across the system.

452.

For example, from 2022 through April 2023, these reports available to GDC leadership, such as Defendant Oliver and Defendant Clark included 1,045 incidents of violence, including assaults, fights, and homicides.

453.

Georgia prisons also produce comprehensive reports of statistics monthly, including the number of assaults, deaths, and uses of force. Defendant Oliver and Defendant Clark read these reports.

454.

Defendant Oliver and Defendant Clark are likewise aware of factors that increase the risk of violence in GDC facilities,

455.

Defendant Oliver and Defendant Clark likewise have been on notice of systemic deficiencies that contribute to harm in Georgia's prisons.

456.

Year after year, the prisons continue to collect enormous amounts of contraband, including weapons, drugs, and electronics, from within prisons across the system. Defendant Oliver and Defendant Clark are aware of this.

457.

GDC officials also have acknowledged its facilities are in dire need of repair.

458.

The State of Georgia has closed some facilities and undertaken renovations in others.

459.

For example, in early 2022, GDC closed Georgia State Prison, a notoriously violent and dilapidated prison.

460.

In 2023, GDC announced plans to close or repurpose Lee Arrendale State Prison, and began to implement plans to open a larger, renovated women's prison in McRae, Georgia, to which most of the Lee Arrendale population would be moved.

461.

The State also recently allocated funds for a new state prison in Washington County, to replace the current Washington State Prison, as well as some increased funding for facility maintenance and repairs statewide.

462.

The GDC also temporarily closed Autry State Prison for renovations, and has undertaken renovation projects, including lock "hardening" and other improvements, at other prisons.

463.

Through their own data and public attention, Defendant Oliver and Defendant Clark have been aware that systemic deficiencies within the Georgia prison system increase the risk of harm to the people in its custody.

464.

Defendant Oliver's and Defendant Clark's efforts have been inadequate, as evidenced by the ongoing harm and significant risk of serious harm in the prisons.

465.

It is plainly evident, from not only the staffing levels and crime in the prisons but also by the prevalence of harm, that Georgia prisons expose the people it incarcerates to a substantial risk of serious harm, and that Defendant Oliver's and Defendant Clark's, policies and practices have failed to address the pervasive problems.

466.

Defendant Oliver and Defendant Clark have known of the substantial risk of serious harm presented by widespread violence in Georgia prisons, but rather than address the violence, they have failed to take reasonable steps to address those unconstitutional conditions.

467.

The constitutional deprivations caused by Defendant Oliver and Defendant Clark led directly to the Attack, injury, deficient medical care, and pain and suffering of Plaintiff.

**COUNT I**
**Section 1983 Claims under Eighth Amendment:**
**Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment**
**(Against Defendant Martin, Individually)**

468.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-94 of the instant Complaint as if fully set forth herein verbatim.

469.

Plaintiff suffered from objectively serious medical needs while in solitary confinement as indicated by the following non-exhaustive list of facts:

a. As a result of the Attack, Plaintiff sustained at least 14 stab wounds all over his body and fractures to his face.

b. As a result of the Attack, Plaintiff suffered from a left orbital floor fracture and maxillary sinus fracture.

c. As a result of the Attack, Plaintiff sustained one complex laceration of the left eyelid.

d. After the Attack, Plaintiff was taken to the hospital.

e. At the hospital and at Smith State Prison after returning from the hospital, Plaintiff began coughing up blood.

f. Furthermore, at the hospital, providers saw scattered skin lacerations which appeared deepest at the level of the left flank with gas extending to the fascial planes of the oblique musculature with tiny underlying lateral abdominal wall fat filled hernia measuring 8 mm.

g. Plaintiff suffered from a single 5 cm laceration to the back of the skull which was repaired with 5 staples at the hospital.

h. At the hospital, providers classified Plaintiff's injuries as "acute illness or injury that poses a threat to life or bodily functions".

i. According to providers at the hospital, Plaintiff "presented to the ER as a trauma level 1 activation and has the potential to be critically injured with a high probability of a sudden significant deterioration in condition requiring constant medical attention and the highest level of preparedness to intervene urgently."

j. According to providers at the hospital, "Patient will need to have scalp staples removed in 7-10 days by any provider."

k. Plaintiff received other staples and stitches at the hospital which medically required removal after Plaintiff's treatment at the hospital.

Such staples and stitches were located on his eye and all over his body where he sustained stab wounds.

l. When Plaintiff returned to Smith State Prison, he continued to cough up blood, require care for his stab wounds, and require care for his maimed eye.

470.

Defendant Martin was deliberately indifferent to Plaintiff's serious medical needs while in solitary confinement and Defendant Martin's response to Plaintiff's pleas for stitches and staples removals as well as requested medical treatment were objectively insufficient, as indicated by the following list of non-exhaustive facts:

a. As of May 17, 2023, Plaintiff was not receiving the medical care he needed due to Defendant Martin refusing to have him taken to the medical wing.

b. In May of 2023, Defendant Martin did not let Plaintiff go to medical to get stitches out.

c. When refusing to allow Plaintiff to go to the medical wing to allow for him to get his stitches out, Defendant Martin would make little jokes and say things like "if it wasn't for me your ass wouldn't be living".

d. When refusing to allow Plaintiff to go to the medical wing to allow for him to get his stitches out, Defendant Martin would say things like, "you know we don't have any officers Luckett" and "you living, you'll be alright".

e. In May of 2023, Unit Manager Sharpe told Plaintiff that couldn't go to medical to have his stitches taken out because of a lack of staff.

f. Eventually, when one of the Prison nurses did come to solitary confinement where Plaintiff was staying to do pill call, she saw that Plaintiff had stitches that were stuck in his eyelid, and she ended up calling Plaintiff to medical to have the stitches taken out.

g. During Plaintiff's time after the Attack at Smith State Prison, Defendant Martin forced Plaintiff to wait several days for his stitches and staples to be taken out.

h. Because many of Plaintiff's requests to have his staples and stitches taken out kept getting denied, Plaintiff was forced to attempt to take his some of his staples and stitches out without medical providers in his cell.

i. In May of 2023, Plaintiff was denied eye specialist appointments by Defendant Martin for his eye injuries.

j. In May of 2023, Plaintiff was denied medical treatment by Defendant Martin relating to his coughing up of blood.

k. In August of 2023, Plaintiff was still not receiving sufficient medical attention for his serious injuries and was experiencing grey spots and blurred vision in his right eye.

l. In September of 2023, Plaintiff was still being denied proper medical treatment and needed surgery on his eye to prevent the worsening of his vision as well as potential blindness.

471.

After Plaintiff's multiple requests for stitches/staples removals as well as other medical needs and after seeing Plaintiff's wounds, Defendant Martin had subjective awareness of the facts signaling the need for medical attention as Plaintiff's wounds were in critical stages of healing and if not cared for properly, would cause Plaintiff prolonged pain and suffering as well as permanent damage.

472.

Required action by Defendant Martin upon learning of Plaintiff's needs for wound and other medical care would be to notify medical staff of Plaintiff's medical needs or even set up a time to take Plaintiff to the medical wing. However, Defendant Martin instead was deliberately indifferent to Plaintiff's pain and well-being and did not want to take Plaintiff to the medical wing.

473.

Defendant Martin's refusal and failure to provide medical attention or call for medical attention for Plaintiff after Plaintiff's numerous pleas for help caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

474.

Defendant Martin is not entitled to qualified immunity for her conduct as her deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

475.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT II**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs**
**(Against Defendant Martin, Individually)**

476.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-94 of the instant Complaint as if fully set forth herein verbatim.

477.

Defendant Martin is liable to Plaintiff for her failures to adequately supervise prison staff, regarding the provision of medical treatment to Plaintiff while in solitary confinement.

478.

Defendant Martin was subjectively aware of the actions and omissions of her subordinates. This is supported by the fact that Defendant Martin led by example and participated in the unconstitutional conduct described herein.

479.

Defendant Martin ratified the actions and omissions of her subordinates while Plaintiff was in solitary confinement, by causing others to outright refuse Plaintiff's stitch/staple removals and other medical care as well as outright refusing Plaintiff's medical requests herself.

480.

Defendant Martin refused to take action to supervise her staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, pain and suffering, constitutional deprivations, medical bills, and other harms and damages.

481.

Defendant Martin's refusal to take action to supervise her staff to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

482.

Defendant Martin's personal participation as described herein caused Plaintiff's stitches and staples to not get removed and this caused Plaintiff prolonged pain and suffering as well as a delayed recovery.

483.

Defendant Martin is not entitled to qualified immunity for her conduct in failing to supervise staff when they refused medical care to Plaintiff while Plaintiff was in solitary confinement.

484.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages

**COUNT III**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Supervisory Claims**
**(Against Defendant Adams, Individually and Defendant Beasley, Individually)**

485.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-181 of the instant Complaint as if fully set forth herein verbatim.

486.

Defendant Adams was the Warden at Smith State Prison up until February 8, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

487.

Defendant Adams's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

488.

Defendant Beasley was the Warden at Smith State Prison after March 1, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

489.

Defendant Beasley's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

490.

Defendant Adams is sued for his policy making, failures to investigate incidents of violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, supervisory conduct in the operation and management of Smith State Prison as well as for the harms created by his illegal smuggling activity which had not been corrected, and in part caused Plaintiff's Attack and injuries.

491.

Defendant Beasley is sued for his policy making, failures to maintain security policies, failures to supervise prison staff, failures to investigate incidents of violence as well as failing to keep the prison safe, secure, and properly staffed in order to prevent inmate-on-inmate violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, failures to ensure safe and efficient delivery of medical care, failures to ensure rounds were being

conducted properly and effectively, and supervisory conduct in the operation and management of Smith State Prison.

492.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented Defendant Adams and Defendant Beasley, as well as those under their supervision, from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

493.

Plaintiff's constitutional rights were violated by Defendant Adams's subordinates, which were correctional officers on duty who were responsible for investigating contraband and incidents of violence and maintaining the facilities, as he was subjected to the unconstitutional conditions described in this Complaint and the Attack which injured and maimed him with man-made shanks.

494.

Plaintiff's constitutional rights were violated by Defendant Beasley's subordinates, which were correctional officers on duty who were responsible for maintaining a presence around inmates, investigating contraband and incidents of violence, and maintaining the facilities, as he was subjected to the unconstitutional

conditions described in this Complaint, the Attack which injured and maimed him, and the constitutionally deficient medical care he received afterwards.

495.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, insufficient security rounds, failures to keep a presence around inmates, and compromised correctional officers, among other things, that put Defendant Adams on notice of the need to take action and he failed to do so.

496.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, insufficient security rounds, failures to keep a presence around inmates, and compromised correctional officers, among other things, that put Defendant Beasley on notice of the need to take action and he failed to do so.

497.

Defendant Adams is liable to Plaintiff for his failures to adequately supervise prison staff regarding the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff, deficient investigations into incidents of violence and the failure to maintain the prison facilities.

498.

Defendant Beasley is liable to Plaintiff for his failures to adequately supervise prison staff and correctional officers on duty, regarding the prevention of the Attack onto Plaintiff, the presence and staffing of correctional officers around inmates to maintain security, dilapidation of facilities, the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff, and the constitutionally deficient medical care Plaintiff received afterwards.

499.

Defendant Adams was subjectively aware of the actions and omissions of the prison staff who allowed the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff and the deficient investigations into incidents of violence and the failure to maintain the prison facilities. This is supported by the fact that Defendant Adams had seen and signed off on the incidents of violence and findings of contraband. This is also supported

by the fact that Defendant Adams was charged with racketeering activity associated with a smuggling ring operating inside the prison.

500.

Defendant Beasley was subjectively aware of the actions and omissions of correctional officers on duty as well as the systematic violence and free flow of contraband at Smith State Prison. This is supported by the fact that Defendant Beasley had seen and signed off on the incidents of violence, incidents of deficient medical care, and findings of contraband.

501.

Defendant Adams ratified the actions and omissions of his subordinates by participating in a smuggling ring at the prison, failing to enforce and enact security practices such as the performance of security rounds, failing to control the free-flow of contraband, and understaffing the prison, among other things.

502.

Defendant Beasley ratified the actions and omissions of his subordinates by failing to enforce and enact security practices such as the performance of security rounds, maintenance of guards around inmates, failing to control the free-flow of contraband, and failing to respond to and investigate incidents and complaints of violence, among other things.

503.

Defendant Adams and Defendant Beasley refused to take action to supervise their staff, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, to restrict the free flow of contraband, and to adequately staff the facility, which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

504.

Defendant Adams and Defendant Beasley fostered an unreasonable environment of violence which motivated and encouraged inmates to commit violence against each other and which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

505.

Defendant Adams's and Defendant Beasley's personal participation as described herein caused Plaintiff to be attacked, injured, and maimed.

506.

Violence and terror reign at Smith State Prison to such an extent that the Attack of Plaintiff is actionable under clearly established federal law.

507.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

508.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

509.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

510.

Defendant Adams and Defendant Beasley are not entitled to qualified immunity for their conduct in failing to supervise their staff, failing to investigate and prevent incidents and complaints of violence, failing to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of

other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to adequately staff the facility and to maintain a presence of correctional officers, and failing to take action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

511.

The unconstitutional policies and practices related to the handling of inmates at Smith State Prison, failures to create adequate local security policies, inadequate security practices relating to performing rounds, failures to maintain a security presence near inmates, and investigating acts of violence, failures to adopt adequate local prison policies on maintaining prison structures and facilities, inadequate practices on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate staffing practices, inadequate practices on medical care in emergency situations, and others which were created and effectuated by Defendant Adams and Defendant Beasley are described in thorough detail in allegations 95-180 and are incorporated herein. In

those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.[1]

512.

Such policies and practices resulted in Defendant correctional officers on duty who were responsible for conducting rounds, maintaining a presence near inmates, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

513.

Defendant Adams and Defendant Beasley carried out and put such policies into place, and such unconstitutional policies were persistent and wide-spread. Factual support for this contention is detailed thoroughly in allegations 95-180.

514.

Defendant Adams had authority and responsibility over the governing of the Smith State Prison and its operations and had the authority and responsibility of implementing some policies and procedures for the Prison. Defendant Adams also implemented practices which were followed by his subordinates.

515.

[1] The Eleventh Circuit has described four main types or categories of shotgun pleadings. The first type is a complaint containing "multiple counts where each count adopts the allegations of all preceding **counts**, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) (emphasis added). Here, however, Plaintiff has not incorporated the entire complaint—nor has Plaintiff incorporated prior counts—into each count of the Complaint; instead, Plaintiff has incorporated only specifically enumerated facts that are specifically relevant to that count.

Defendant Beasley had authority and responsibility over the governing of the Smith State Prison and its operations and has the authority and responsibility of implementing some policies and procedures for the Prison. Defendant Beasley also implemented practices which were followed by his subordinates.

516.

Defendant Adams had supervisory responsibility as well as some final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the Smith State Prison local policies, procedures, and practices related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, and investigations into violence, among other things.

517.

Defendant Beasley had supervisory responsibility as well as some final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the Smith State Prison local policies, procedures, and practices related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, investigations into violence, the conducting of rounds, maintenance of a presence of security, and the provision of medical care, among other things.

518.

Defendant Adams implemented and carried out Smith State Prison local policies, procedures, and practices that constituted deliberate indifference to

Plaintiff's substantial risks of serious harm. Such policies, procedures, and practices are described in great detail in allegations 95-180 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

519.

Defendant Adams's supervision at Smith State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm. Such supervision is described in great detail in allegations 95-180 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

520.

Defendant Beasley implemented and carried out Smith State Prison local policies, procedures, and practices that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such policies, procedures, and practices are described in great detail in allegations 95-180 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

521.

Defendant Beasley's supervision at Smith State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious

medical needs. Such supervision is described in great detail in allegations 95-180 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

522.

Defendant Adams and Defendant Beasley disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 95-180.

523.

Defendant Adams's and Defendant Beasley's unconstitutional policies, procedures, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, was attacked because of the absence of officers and the failure to maintain security, suffered from delayed medical care as a result of short staffing and a failure to conduct sufficient security rounds, and suffered from delayed medical care, among other things.

524.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Adams and Defendant Beasley related to the handling of inmates at

Smith State Prison, failures to supervise prison staff, inadequate practices on maintaining facility structures and facilities, inadequate security practices relating to performing rounds, failures to maintain a security presence, and investigating acts of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate practices in providing medical care in emergency situations and others are laid out in great detail in allegations 95-180. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

525.

Such customs, practices, and supervision created and carried out by Defendant Adams and Defendant Beasley constituted a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 95-180.

526.

Such customs, practices, and supervision created and carried out by Defendant Adams and Defendant Beasley constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 95-180 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

527.

Defendant Adams and Defendant Beasley disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 95-180.

528.

Such customs, practices, and supervision resulted in correctional officers on duty who were responsible for conducting rounds, maintaining a security presence, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

529.

Defendant Adams's and Defendant Beasley's unconstitutional customs, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, was attacked because of the absence of officers and the failure to maintain security, suffered from delayed medical care as a result of short staffing, and suffered from delayed medical care, among other things.

530.

Defendant Adams's and Defendant Beasley's above failures amount to deliberate indifference to the safety of inmates in violation of the Eighth Amendment.

531.

Defendant Adams and Defendant Beasley had actual and constructive knowledge of widespread, persistent patterns of inmate-on-inmate violence as well as of the other constitutional violations described herein.

532.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

533.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

534.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

535.

Defendant Adams and Defendant Beasley are not entitled to qualified immunity for their conduct in failing to supervise their staff, failing to investigate and prevent incidents and complaints of violence, failing to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to maintain an adequate security presence, failing to adequately staff the facility, and failing to take action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration, as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

536.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Adams and Defendant Beasley.

537.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical

bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT IV**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Supervisory Liability**
**(Against Defendant Oliver in his individual capacity and Defendant Clark in his individual capacity)**

538.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-467 of the instant Complaint as if fully set forth herein verbatim.

539.

Defendant Oliver was the Commissioner of the Georgia Department of Corrections and was responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

540.

At all relevant times, Defendant Clark was the Director of Engineering & Construction Services for the Georgia Department of Corrections and was responsible for management and oversight of the ECS division, which is

responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

541.

Defendant Oliver is sued for his policy making, customs, staffing and supervisory conduct in the operation and management of Georgia prisons, which include Smith State Prison.

542.

Defendant Clark is sued for his policy making, customs, and supervisory conduct related to maintenance and repair practices at Georgia prisons, which include Smith State Prison.

543.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented the Defendants from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

544.

Plaintiff's constitutional rights were violated by Defendant Oliver's and Defendant Clark's subordinates as he was subjected to the Attack which injured and maimed him, suffered as a result of understaffing, failures to conduct security rounds, and failures to maintain a security presence, was stabbed with a makeshift weapon, and suffered as a result of constitutionally deficient medical care due to a lack of security staff.

545.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, failures to maintain a security presence, severe understaffing, and compromised correctional officers, among other things, that put Defendant Oliver on notice of the need to take action and he failed to do so.

546.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional

living conditions, poor supervision of staff, and severe understaffing, among other things, that put Defendant Clark on notice of the need to take action and he failed to do so.

547.

Violence and terror reign at Georgia prisons, including Smith State Prison to such an extent that the Attack onto Plaintiff is actionable under clearly established federal law.

548.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

549.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

550.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)

(citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

551.

Defendant Oliver is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, failures to maintain a security presence, severe understaffing, and compromised correctional officers as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

552.

Defendant Clark is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional living conditions, poor supervision of staff, and severe understaffing as indicated

by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty*., 50 F.3d 1579 (11th Cir. 1995) and others.

553.

The unconstitutional policies related to the handling of inmates at Georgia prisons, including Smith State Prison, inadequate policies on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate staffing policies and practices, inadequate staffing for medical care, and others which were created and effectuated by Defendant Oliver are described in thorough detail in allegations 181-467 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

554.

The unconstitutional policies related to the handling of inmates at Georgia prisons, including Smith State Prison, practices leading to unclean, unsafe, and unconstitutional living conditions, failures to adopt adequate policies on maintaining prison structures and facilities, inadequate practices regarding the maintenance of prison structures and facilities, inadequate practices to prevent the creation of contraband, and others which were created and effectuated by Defendant Clark are described in thorough detail in allegations 181-467 and are

incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

555.

Such policies resulted in Defendant Oliver's and Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's constitutional rights.

556.

Defendant Oliver and Defendant Clark carried out and put such policies into place, and such unconstitutional policies were persistent and wide-spread. Factual support for this contention is detailed thoroughly in allegations 181-467.

557.

Defendant Oliver had authority and responsibility over staffing Georgia prisons and had the authority and responsibility of implementing policies and procedures for the Georgia prisons.

558.

Defendant Clark had the authority and responsibility for carrying out the policies and procedures related to maintenance of Georgia prisons and was responsible for supervising and making policies and practices for the maintenance of Georgia prisons.

559.

Defendant Oliver had the final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the policies and procedures related to inmate-on-inmate violence, contraband prevention and removal, facility staffing, budget allocation decisions, and the provision of medical care, among other things.

560.

Defendant Clark had supervisory responsibility as well as policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the maintenance and repair of Georgia prisons, which includes Smith State Prison.

561.

Defendant Oliver and Defendant Clark implemented and carried out policies and procedures that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. They also exposed Plaintiff to unreasonable risks of harm. Such policies and procedures are described in great detail in allegations 181-467 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

562.

Defendant Oliver and Defendant Clark disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 181-467.

563.

Defendant Oliver's and Defendant Clark's unconstitutional policies, procedures, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and stabbed by the makeshift weapons, suffered as a result of short staffing, failures to conduct sufficient security rounds, and failures to maintain a security presence, and suffered as a result of delayed medical treatment, among other things.

564.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Oliver related to the handling of inmates at Georgia Prisons, including Smith State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, severe understaffing leading to failures to conduct security rounds and failures to maintain a security presence, severe understaffing, failures to prevent

inmate-on-inmate violence and the free flow of contraband, failures to provide adequate medical services, and others are laid out in great detail in allegations 181-467. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

565.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Clark related to the handling of inmates at Georgia Prisons, including Smith State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, failures to maintain prison structures and facilities to prevent the creation of makeshift weapons, and others are laid out in great detail in allegations 181-467. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

566.

Such customs, practices, courses of conduct, and supervision created and carried out by Defendant Oliver and Defendant Clark constitute a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 181-467.

567.

Such customs, practices, courses of conduct and supervision created and carried out by Defendant Oliver and Defendant Clark constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 181-467 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

568.

Such customs, practices, courses of conduct and supervision resulted in Defendant Oliver's and Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's constitutional rights.

569.

Defendant Oliver and Defendant Clark disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 181-467.

570.

Defendant Oliver's and Defendant Clark's unconstitutional customs, practices, courses of conduct and supervision caused and were a moving force behind Plaintiff's constitutional deprivations, injuries, and pain and suffering, as

Plaintiff was attacked, maimed, and stabbed by the makeshift weapons, suffered as a result of short staffing, a failure to conduct sufficient security rounds, and a failure to maintain a security presence, and suffered as a result of delayed medical treatment, among other things.

571.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

572.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

573.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

574.

Defendant Oliver and Defendant Clark are not entitled to qualified immunity for their conduct in failing to properly staff facilities in order to prevent inmate-on-inmate violence and the free flow of contraband, failing to ensure properly conducted security rounds and wellbeing rounds, failing to maintain a security presence, and failing to maintain facilities causing a proliferation of makeshift weapons as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

575.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Oliver and Defendant Clark.

576.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT V**
**Punitive Damages**
**(Against Defendant Oliver, individually, Defendant Clark, individually, Defendant Adams, individually, Defendant Beasley, individually, and Defendant Martin, individually)**

577.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-467 of the instant Complaint as if fully set forth herein verbatim.

578.

Defendant Oliver's, Defendant Clark's, Defendant Adams's, Defendant Beasley's, and Defendant Martin's, actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against said Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

579.

Defendant Oliver's actions in enforcing and employing unconstitutional staffing policies, customs, supervision and practices with knowledge of the horrible consequences, including death, assaults, violence, and inadequate medical care which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Oliver in an amount to be determined

in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

580.

Defendant Clark's actions in enforcing and employing unconstitutional policies, customs, supervision and practices related to the maintenance of prison facilities with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Clark in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

581.

Defendant Adams's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to the free flow of contraband and investigations into violence, staffing, medical care, and security practices with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff

to recover punitive damages against Defendant Adams in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

582.

Defendant Adams's actions allowing and participating in the free flow of contraband showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Adams in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

583.

Defendant Beasley's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to the free flow of contraband and investigations into violence, staffing, medical care, and security practices with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Beasley in an amount to be

determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

584.

Defendant Martin's actions in being deliberately indifferent to Plaintiff's serious medical needs by outright refusing to help Plaintiff get his staples/stitches removed and other medical care as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Martin in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

585.

Defendant Martin's actions in supervising and ratifying of prison staff being deliberately indifferent to Plaintiff's serious medical needs by outright refusing to help Plaintiff get his staples/stitches removed and other medical care as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Martin in an amount to be determined in the enlightened conscience of

impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

586.

Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, and Defendant Martin, acted with the specific intent to cause harm in that said Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

587.

Wherefore, Plaintiff is entitled to recover punitive damages against Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, and Defendant Martin as determined by the enlightened conscience of impartial jurors.

## COUNT XI
## Negligence And Gross Negligence
## Liability Pursuant to O.C.G.A. § 50-21-20 et. seq
## (Against Defendant Georgia Department of Corrections)

588.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-94 of the instant Complaint as if fully set forth herein verbatim.

589.

GDC officers and employees, who responded to the Attack, owed a duty to Plaintiff not to expose him to unreasonable risks of harm, and not to violate the written policies of the Smith State Prison and the Georgia Department of Corrections with reckless disregard.

590.

GDC officers and employees, who responded to the Attack, owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

591.

GDC officers and employees, who responded to the Attack, breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Smith State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

a. Failing to provide adequate medical aid to Plaintiff directly after the Attack for his life-threatening injuries as described in this Complaint.
b. Failing to follow the GDC policies and procedures on the provision of medical care including but not limited to Evaluation Services for Urgent and Emergent Healthcare Requests (507.04.39) and Urgent and Emergent Care Services (507.04.37).

592.

GDC officers and employees, who responded to the Attack, failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they failed to provide adequate medical care for Plaintiff's wounds and life-threatening injuries as described in this Complaint when Plaintiff was bleeding out of open wounds and displaying obvious signs of a serious eye injury.

593.

GDC officers' and employees', who responded to the Attack, negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

594.

GDC officers and employees who failed to provide adequate medical care to Plaintiff after the Attack are not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because their tortious acts were ministerial in nature, and those officers and employees performed them negligently.

595.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of GDC officers and employees, who responded to the Attack, which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

596.

Unit Manager Martin and other officers/employees owed a duty to Plaintiff not to expose him to unreasonable risks of harm, and not to violate the written policies of the Smith State Prison and the Georgia Department of Corrections with reckless disregard.

597.

Unit Manager Martin and other officers/employees owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

598.

Unit Manager Martin and other officers/employees breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Smith State Prison as well as the GDC with reckless

disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

a. Refusing to take Plaintiff to the medical wing or otherwise help effectuate medical care when it was clear that Plaintiff needed and requested medical care while in solitary confinement as described in this Complaint.

b. Failing to follow the GDC policies and procedures on the provision of medical care.

599.

Unit Manager Martin and other employees/officers failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they refused to take Plaintiff to the medical wing or otherwise help effectuate medical care when it was clear that Plaintiff needed and requested medical care as described in this Complaint.

600.

Unit Manager Martin's and other employees'/officers' negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

601.

Unit Manager Martin is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because her tortious acts were ministerial in nature, and Unit Manager Martin performed them negligently.

602.

The other officers and employees who refused medical care to Plaintiff while in solitary confinement are not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because their tortious acts were ministerial in nature, and those officers and employees performed them negligently.

603.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of Unit Manager Martin and other employees/officers which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

604.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering,

extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for damages and request from the Court:

a. That summons and process issue as required by law;

b. To allow a trial by jury on all issues so triable;

c. That judgment issue in favor of Plaintiff and against Defendants on all counts of Plaintiff's Complaint;

d. To award Plaintiff compensatory damages against all Defendants;

e. To grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

f. That judgment issue in favor of Plaintiff and against Defendants awarding the Plaintiff general, special, and compensatory damages, including but not limited to physical and mental pain and suffering, extreme mental distress, medical bills, lost capacity to earn, and other necessary expenses in an amount to be proven at trial;

g. That judgment issue in favor of Plaintiff and against Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, and

Defendant Martin, awarding Plaintiff punitive damages in an amount determined at trial by the enlightened conscience of a fair and impartial jury; and;

h. To award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 24th day of April, 2025.

**ERIC J. HERTZ, P.C.**

By: ***/s/ Alex S. Hertz***
ERIC J. HERTZ
GA State Bar No. 349501
*hertz@hertz-law.com*
ALEX S. HERTZ
Georgia Bar No. 420971
*alex@hertz-law.com*

*Counsel for Plaintiff*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116