**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

|  |  |
|---|---|
| GEORGE LUCKETT,<br><br>      Plaintiff,<br><br>    v.<br><br>TYRONE OLIVER, in his individual capacity;<br>JAMIE CLARK, in his individual capacity;<br>BRIAN ADAMS, in his individual capacity;<br>JACOB BEASLEY, in his individual capacity;<br>KATHY MARTIN, in her individual capacity;<br>and GEORGIA DEPARTMENT OF<br>CORRECTIONS,<br><br>      Defendants. | CIVIL ACTION NO.: 6:25-cv-47 |

## **O R D E R**

Plaintiff George Luckett brought this action in the State Court of Tattnall County, Georgia, after he was allegedly attacked while incarcerated at Smith State Prison ("SSP"). (Doc. 1-1, pp. 1, 10.)  Defendants are Tyrone Oliver, Jamie Clark, Brian Adams, Jacob Beasley, and Kathy Martin, all in their individual capacities, and the Georgia Department of Corrections ("GDC"). (Doc. 19.)  As to Defendant Adams, Plaintiff alleges he is liable for violating Plaintiff's Eighth Amendment rights pursuant to 42 U.S.C. § 1983. (Id. at pp. 93–98.) Before the Court is Defendant Adams's Motion to Dismiss Plaintiff's Amended Complaint. (Doc. 17.)  For the reasons below, the Court **DENIES** Defendant's Motion. (Id.)

**BACKGROUND**

**I.    Factual Background**

The following facts are alleged in Plaintiff's Amended Complaint.  (Doc. 19.)  Adams served as the warden of SSP from October 2019 until February 8, 2023.  (Id. at pp. 26–27.)  As warden, Adams's responsibilities included overseeing SSP's daily operations, managing SSP's staff, and ensuring the safety and security of SSP's staff and inmates.  (Id. at p. 26.)  Plaintiff alleges that, during Adams's tenure as warden, SSP experienced a steady decline, violence skyrocketed, conditions for inmates deteriorated at an unprecedented rate, and assaults on staff increased with little to no disciplinary actions taken against offenders.  (Id. at p. 27.)  According to Plaintiff, this decline was caused by Adams's mismanagement as warden.  (See id. at pp. 26–34.)

Adams allegedly failed, in particular, to ensure proper maintenance of metal, ceramic, and plastic components of SSP's infrastructure.  (Id. at p. 32.)  Inmates used this crumbling infrastructure to craft makeshift weapons—including knives, or "shanks"—and would conceal and smuggle such contraband using holes and hiding spots in SSP's poorly maintained facilities.  (Id. at p. 25.)  Adams was aware of the dangers caused by SSP's poor condition, but failed to adequately monitor, repair, or remedy the situation.  (Id. at p. 32.)  Further, due to Adams's supervision, SSP staff did not conduct adequate security rounds to identify and remove contraband.  (Id.)  Also, because of Adams's supervision, customs, and practices as warden, SSP did not adequately investigate the causes of violence in the prison or identify dangerous situations and avoid occurrences of violence.  (Id. at pp. 33–34.)  Many acts of violence were not referred for further investigation.  (Id. at p. 34.)  Indeed, Plaintiff alleges that, "[a]s a result of . . . Adams's supervision, [SSP] had customs, practices and courses of conduct that are so widespread that they

have acquired the force of law . . . whereby correctional employees would not conduct investigations into incidents of violence nor correct them as well as not search for and confiscate makeshift weapons from inmates." (Id. at p. 96.)  Adams thus "fostered an . . . environment of violence which motivated and encouraged inmates [at SSP] to commit violence against each other." (Id.)

During Adams's time as warden, violent acts by incarcerated people against other incarcerated people, including homicides and stabbings, were very common at SSP. (Id. at p. 19.) Plaintiff claims that at least seventeen homicides occurred at SSP between 2020 and 2023, and he provides a list and descriptions of numerous homicides and incidents of violence at SSP during Adams's tenure. (See id. at pp. l9–25.)  Plaintiff states that Adams failed to take action despite SSP's "history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, failures to investigate violence[,] and the free flow of contraband." (Id. at p. 95.)  Plaintiff also alleges that

> Adams was subjectively aware of systematic violence at [SSP] as he reviewed numerous incident reports of this violence, he knew of and witnessed numerous emergency transports, he was well aware of the deaths which occurred, received and reviewed reports of the violence, received and reviewed the reports of mass contraband, and was criticized by the public and news agencies for the violence.

(Id. at pp. 97–98.)

Plaintiff alleges that Adams's time as warden ended on February 8, 2023, when the Georgia Bureau of Investigations ("GBI") arrested Adams on charges that he received cash payments as part of a widespread contraband operation at SSP. (Id. at p. 27.)  According to Plaintiff, Adams was charged with participating in a smuggling ring operation inside SSP which led to increases in prison violence and contraband. (Id. at pp. 28, 31, 94.)  The charges against Adams were false statements and writings; concealment of facts (O.C.G.A. § 16-10-20); violation of oath by public

3

officer (O.C.G.A. § 16-10-1); bribery (O.C.G.A. § 16-10-2); and violations under the RICO Act (O.C.G.A. § 16-14-1). (Id.)

In the weeks after Adams ceased being warden, between February 8 and April 28, incidents of violence continued to occur at SSP. (See id. at pp. 22–23.) On April 28, 2023, Plaintiff was attacked and stabbed multiple times while he was serving a sentence at SSP (the "Attack"). (Id. at pp. 9–10.) On the day of the Attack, there were no guards around the area where Plaintiff was attacked, and SSP was understaffed. (Id. at p. 10.) Plaintiff's attackers used makeshift shanks, made from the crumbling infrastructure of SSP. (Id.) Plaintiff sustained life threatening injuries, including at least 14 stab wounds all over his body and fractures to his face. (Id. at p. 11.) Plaintiff alleges that Adams's supervision caused and was a moving force behind Plaintiff's constitutional deprivations, personal injury, and other harms and damages because he was attacked with makeshift knives/machetes which came from the infrastructure of SSP and were smuggled about SSP without intervention, and because he was violently attacked due to a culture where violent incidents were not investigated. (Id. at p. 97.)

## II.    Procedural Background

Plaintiff initially filed suit in the State Court of Tattnall County. (See doc. 1-1.) Defendant removed the case to this Court, (doc. 1), and Plaintiff subsequently filed an Amended Complaint, (doc. 19). Only two of the six counts in Plaintiff's Amended Complaint are against Adams: Counts III and VII. Count III alleges a "Section 1983 Claim under Eighth Amendment: Supervisory Claim for Uncontrolled Violence Caused by Participation in Smuggling Ring, Failure to Control Contraband, Failure to Perform Maintenance, and Failure to Investigate Violence (Against Defendant Adams, Individually)." (Id. at p. 93.) Count VII is for "Punitive Damages (Against . .

. Defendant Adams, individually, [and other Defendants in their individual capacities]).” (Id. at p. 114.)

Plaintiff alleges that Adams’s mismanagement of SSP caused Plaintiff to suffer deprivation of his Eighth Amendment right to be free from cruel and unusual punishment, (Count III), and he also alleges he is entitled to punitive damages against Adams because his actions “showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences,” (Count VII). (Id. pp. 93–98, 114–18). Defendant Adams filed the at-issue Motion to Dismiss Plaintiff’s Amended Complaint, (doc. 17),[1] and Plaintiff filed a Response, (doc. 20).

**LEGAL STANDARD**

When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the complaint and limit its consideration to the pleadings and attached exhibits. Bell Atlantic Corp v. Twombly, 550 U.S. 544, 556 (2007); Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009). “To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible “when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Id. When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must “accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff.” Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). However,

---

[1] Defendant Adams filed his Motion to Dismiss after Plaintiff filed a Motion to Amend Complaint (to which Plaintiff had attached a copy of the proposed Amended Complaint as an exhibit thereto) and prior to the Court’s Order granting the Motion to Amend and directing that the Amended Complaint be filed on the docket. This explains why the Motion to Dismiss has a lower docket entry number (doc. 17) than the pleading it seeks dismissal of (the Amended Complaint, at doc. 19).

this tenet "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft, 556 U.S. at 678.  Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Ashcroft, 556 U.S. at 678 (internal quotations and citation omitted).  Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12(b)(6) allows a court "to dismiss a claim on the basis of a dispositive issue of law").

**DISCUSSION**

"A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment."  Marsh v. Butler Cnty., 268 F.3d 1014, 1028 (11th Cir. 2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  Count III alleges that Adams deprived Plaintiff of this constitutional right by being deliberately indifferent to the risks that ultimately befell him during the Attack and, pursuant to Section 1983, seeks to recover damages from Adams via supervisory liability.  (Doc. 19, pp. 93–98.)  Adams argues Count III (and, as a result, the derivative claim for punitive damages in Count VII) should

6

be dismissed for two reasons. (Doc. 17.) First, Adams argues Count III should be dismissed because he cannot be subjected to supervisory liability for Plaintiff's injuries given that the Attack occurred two months after he was no longer the warden of SSP. (Id. at pp. 5–9.) Second, even if supervisory liability could apply here, Adams asserts Count III should still be dismissed because he is entitled to qualified immunity. (Id. at pp. 9–10.) For the below reasons, the Court rejects Adams's arguments and **DENIES** the Motion to Dismiss. (Id.)

I.      **Supervisory Liability and Deliberate Indifference**

Plaintiff's Eighth Amendment claim against Adams seeks to recover based on supervisory liability. (Doc. 19, pp. 93–98.) Section 1983, which is the basis for the claim, does not make supervisors automatically liable for their subordinates' actions. See Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), overruled in part on other grounds by Pearson, 555 U.S. 223. Instead, Section 1983 only allows for supervisory liability "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Myrick v. Fulton Cnty., 69 F.4th 1277, 1297 (11th Cir. 2023). When it comes to Eighth Amendment failure-to-protect claims, plaintiffs can establish a causal connection sufficient for supervisory liability at least three ways, by showing:

> (1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

Id. at 1298 (citing Matthews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)); see also Cottone, 326 F.3d at 1352.

Here, as best the Court can tell, Plaintiff alleges supervisory liability exists under both the first and the second options.  (Doc. 19, pp. 93–98.)  As to the first option, to establish supervisory liability based on a history of widespread abuse, Eighth Amendment claimants typically must identify "specific features of a facility or its population," Marbury v. Warden, 936 F.3d 1227, 1235 (11th Cir. 2019), that render it particularly violent or "present an objectively substantial risk of serious harm," Marsh, 268 F.3d at 1029.  Then, the plaintiff must show that the official was deliberately indifferent to that substantial risk and, lastly, that the official's indifference caused the plaintiff's injury.  Id.

Here, Plaintiff alleges that, during Adams's tenure as warden, there was "a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, failures to investigate violence[,] and the free flow of contraband, that put Defendant Adams on notice of the need to take action—yet he failed to do so." (Doc. 19, p. 95).  Plaintiff's widespread-abuse allegations meet the requirements for showing a causal-connection that supports supervisory liability.  First, Plaintiff points to numerous "features" of SSP that created an objectively substantial risk of serious harm.  Namely, the Amended Complaint alleges that SSP's "crumbling" infrastructure provided inmates with the necessary components for making and concealing shanks and that SSP's security protocols failed to mitigate the proliferation of these weapons and their use in violent attacks.  (See id. at pp. 18–34.)  Second, Plaintiff has plausibly alleged that Adams was deliberately indifferent to these risk-creating features by claiming that, as warden, he did nothing to address the issues despite being aware of SSP's poor infrastructure, of the inmates' ability to craft shanks from that infrastructure, and of the frequent

use of those shanks during widespread instances of violences.[2]  (Id. at pp. 32, 97.)  Third, Plaintiff

has plausibly alleged that Adams's deliberate indifference caused his injuries.  According to

Plaintiff, his attackers stabbed him with shanks that were crafted, concealed, and popularized for

use in violent attacks as a result of Adams's mismanagement of SSP's infrastructure, security, and

violent culture.  (Id. at pp. 30–31, 93–98.)

Adams argues he "cannot face supervisory liability for conduct that occurred months after

he was no longer a supervisor" because "the two-month temporal gap . . . sever[ed] any arguable

proximate cause" and he "cannot have exhibited deliberate indifference to a situation he could do

nothing about and did not even know of."  (Doc. 17, pp. 5, 7.)  But the fact that Adams was no

longer warden when the Attack occurred does not prevent Plaintiff from stating a claim for

supervisory liability.  Plaintiff's allegation is that "[w]hile Defendant Adams was no longer the

warden at the time of Plaintiff's Attack, the harms created by . . . his unconstitutional

mismanagement of SSP had not been corrected, and this caused Plaintiff's Attack and injuries."

(Doc. 19, p. 31.)  Adams gives no convincing reason why the passage of roughly two months

necessarily prevents his conduct while warden from proximately causing Plaintiff's injuries.

Adams's assertion that his pre-Attack termination preempts Plaintiff from plausibly alleging

"deliberate indifference" also misses the mark.  Adams may be right that, because he was not

warden at the time, he did not have contemporaneous knowledge of the specific Attack that injured

Plaintiff.  However, to plead supervisory liability via a history of widespread abuse, Plaintiff need

only show that Adams was deliberately indifferent to the dangerous features of SSP that ultimately

led to Plaintiff's injuries—not to the precise circumstances of the Attack itself.  See Turner v.

---

[2]  This element is further support by the Amended Complaint's allegations that, when Adams was removed from his position as warden, he was arrested and criminally charged for *participating* in a widespread contraband operation at SSP, which helped enable the widespread violence at SSP.

Dunn, 799 F. Supp. 3d 1208, 1217 (M.D. Ala. 2025) ("Usually, to plead an Eighth Amendment claim, a plaintiff must establish that an official was deliberately indifferent to a specific threat the victim faced.  However, in some cases officials may be liable for their deliberate indifference to a 'generalized risk of violence' or 'history of widespread abuse.'" (citing Marbury, 936 F.3d at 1235)).

Finally, the Court rejects Adams's suggestion that Plaintiff's claim should be dismissed because, when the Attack occurred, he was "without authority to take any actions to prevent or remediate the risk."  (Doc. 17, p. 1.)  Defendant cites no authority for the proposition that supervisory liability is somehow prohibited whenever an individual lacked supervisory authority at the particular time when an injury occurred.  (See generally id.)  Indeed, the only case law that the Court has found addressing this argument squarely rejects it.  See Garza v. Lansing Sch. Dist., 972 F.3d 853, 867–68 (6th Cir. 2020) ("Just as a party need not have been present at the time of the constitutional violation in order to be found supervisorily liable, they need not have current supervisory authority over the alleged violator.") (internal citation omitted); Munyiri v. Maynard, No. CCB-08-1953, 2009 WL 2848663, at *3 (D. Md. Sept. 1, 2009) ("[T]he fact that former Warden Franks was no longer employed with the CBIF at the time the strip searches occurred does not automatically defeat plaintiffs' [Section 1983] claims against him.").

In light of the foregoing, the Court finds that, by alleging facts showing a history of widespread abuse, Plaintiff has plausibly alleged a sufficient causal connection to state an Eighth Amendment claim against Defendant Adams via supervisory liability, notwithstanding that Adams had been arrested and was no longer the warden at the precise time the attack occurred. Accordingly, the Court need not address whether the Amended Complaint's "custom or policy" allegations satisfy the second option for stating a supervisory liability claim, and the Court denies

Adams's motion to dismiss to the extent it is premised on the theory that Plaintiff had failed to state a claim under Section 1983.

## II.      Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The doctrine "is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." Id. (alterations adopted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)).

A defendant first must show that he acted within his discretionary authority. Mobley v. Palm Beach Cnty. Sheriff Dep't., 783 F.3d 1347, 1352 (11th Cir. 2015). If the defendant makes this showing, the burden shifts to the plaintiff to prove: (a) that the defendant violated a constitutional right; and (b) that the right was clearly established at the time of the incident. Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). The Court has discretion in deciding which of those two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). A right is clearly established when, at the time of the officer's conduct, the law was sufficiently clear

that every reasonable official would understand that what he is doing is unlawful.  Myrick, 69 F.4th at 1300.  Plaintiff can show that a constitutional right was clearly established in three ways: (1) citing case law with indistinguishable facts that clearly establishes the constitutional right; (2) pointing to a broad statement of principle within the Constitution, a statute, or case law that clearly establishes the constitutional right; or (3) alleging conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.  Id.

Adams's sole argument that he is entitled to qualified immunity is that, at the time of the alleged constitutional violation, he was not employed at SSP and that he "has been unable to locate any clearly established law that holds a prison official liable for purported constitutional violations that occurred months after he was no longer employed by the government and had no control— constructive or actual—over the conduct or policies and procedures at a facility." (Doc. 17, p. 10.) As discussed above, the fact that Adams was not employed at SSP at the time of the Attack does not automatically defeat Plaintiff's Section 1983 claims against him.  See Discussion Section I, supra.  Given that Plaintiff's claims against Adams do not automatically fail at this stage, the Court turns to whether Plaintiff has sufficiently shown that a constitutional right was clearly established.

Plaintiff argues that Adams is not entitled to qualified immunity because his constitutional violations were clearly established, and Plaintiff reiterates that Adams's alleged conduct occurred while he was in office and the "ill-effects [of his conduct] remained uncorrected at the time of [the Attack]." (Doc. 20, pp. 10–13.)  Plaintiff points to a broad statement of principle within case law that clearly establishes the constitutional right at issue here.  (Id. at p. 12.)  Quoting Farmer v. Brennan, 511 U.S. 825, 828 (1994), Plaintiff argues that "it is well settled that 'a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.'" (Doc 20, p. 12.)  Plaintiff further cites cases such as LaMarca v. Turner, 995 F.2d 1526, 5131–40 (11th Cir. 1993), which indicate that "a failure to ensure reporting of assaults and

12

illegal activities up through the chain of command, failures to investigate violence, failures to control widespread prevalence of weapons, and lack of supervision of officers leading to corruption and incompetence, all committed by a warden, constitute unconstitutional supervisory conduct." (Doc. 20, p. 12.)

As explained above, Plaintiff has plausibly alleged that Adams's supervision (or lack thereof), customs, and practices as warden violated Plaintiff's Eighth Amendment rights. Plaintiff has sufficiently alleged that Adams participated in illegal smuggling, failed to investigate incidents of violence, failed to stop the free flow of contraband, and failed to ensure the performance of maintenance. (Doc. 19, pp. 27–34.) Considering the long-standing precedent that Plaintiff cites, Adams cannot credibly argue that it was not clearly established that his alleged acts and omissions violated the Constitution. Instead, Adams argues that the law was not clearly established that his acts and omissions that occurred when he was Warden could be linked to Plaintiff's injuries that occurred after he was Warden. But Plaintiff has sufficiently alleged that it was clearly established that a supervisor could be held liable for injuries that resulted from his deliberate indifference. Moreover, "[t]he presence of the requisite causation in a case brought under [Section 1983] is normally a question of fact for the jury." Jackson v. Stevens, 694 F. Supp. 2d 1334, 1336 n.1 (M.D. Ga. 2010). Additionally, Plaintiff argues that Adams's alleged illegal activity (including participation in a smuggling ring that increased access in SSP to weapons like those used against Plaintiff in the Attack) is so egregious that a constitutional right was clearly violated, even in the total absence of case law. (Doc. 20, p. 12; see generally doc. 19.) "There need not . . . be a prior case wherein 'the very action in question has previously been held unlawful.'" Keating, 598 F.3d at 766. Given the egregious facts presented here, Plaintiff need not point to case law directly on point. See id.

Because Plaintiff has plausibly and sufficiently alleged that Adams violated a constitutional right that was clearly established at all relevant times, Adams is not protected by qualified immunity.  See Keating, 598 F.3d at 762; Myrick, 69 F.4th at 1300.

**CONCLUSION**

For these reasons, the Court **DENIES** Defendant Adams's Motion to Dismiss, (doc. 17). The stay of discovery, (see doc. 35), remains in place pending a ruling on the remaining Defendants' pending Motion to Dismiss, (doc. 27), which was filed separately from and later than Defendant Adams's Motion.

**SO ORDERED**, this 31st day of March, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

14