**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| GEORGE LUCKETT, | |
| Plaintiff, | CIVIL ACTION NO.: 6:25-cv-47 |
| v. | |
| TYRONE OLIVER, in his individual capacity; JAMIE CLARK, in his individual capacity; BRIAN ADAMS, in his individual capacity; JACOB BEASLEY, in his individual capacity; KATHY MARTIN, in her individual capacity; and GEORGIA DEPARTMENT OF CORRECTIONS, | |
| Defendants. | |

**O R D E R**

Plaintiff George Luckett brought this action in the State Court of Tattnall County, Georgia, against Defendants Tyrone Oliver, Jamie Clark, Brian Adams, Jacob Beasley, and Kathy Martin, all in their individual capacities, and the Georgia Department of Corrections ("GDC"). (Doc. 19.) Before the Court is a Motion for a More Definite Statement or, in the Alternative, Motion to Dismiss filed by Defendants Oliver, Clark, Beasley, Martin, and GDC, (the "Moving Defendants"). (Doc. 27.) For the reasons below, the Motion for a More Definite Statement is **DENIED** and the alternative Motion to Dismiss is **GRANTED in part** and **DENIED in part**. (Id.)

**BACKGROUND**

I.      **Factual Background**

The following facts are alleged in Plaintiff's Amended Complaint. (Doc. 19.) During the events giving rise to Plaintiff's claims, Plaintiff was incarcerated at Smith State Prison ("SSP"), a close security prison in Georgia. (Id. at pp. 9, 19.) SSP's officers and staff are employed by GDC, an entity of the Georgia state government. (Id. at pp. 6–7.) Defendant Oliver became the Commissioner of GDC in January 2023 and served in that role during the events giving rise to this action. (Id. at pp. 3, 60.) As Commissioner, Oliver is responsible for managing GDC's budget as well as GDC's staffing decisions. (Id. at p. 60.) Defendant Clark, at all times relevant to this action, was the Director of GDC's Engineering and Construction Services ("ECS"). (Id. at p. 3.) As Director of ECS, Clark was responsible for management and oversight of the ECS division, which in turn was responsible for the design, construction, and maintenance of the physical infrastructure of Georgia prisons, including SSP. (Id. at pp. 74–75.) Defendant Beasley became the Warden of SSP after March 1, 2023, in which role he was responsible for overseeing SSP's daily operations, management of SSP's staff, and the safety and security of SSP's staff and inmates. (Id. at pp. 5, 35.) At all relevant times, Defendant Martin was employed at SSP as a Unit Manager. (Id. at p. 5.)

Plaintiff alleges that, for years leading up to April 2023, violent assaults with makeshift weapons were a common occurrence at GDC prisons because of poor management of GDC's policies, staffing, security, and infrastructure by Commissioner Oliver and Director Clark. (Id. at pp. 50, 55–56.) GDC prisons have regularly been understaffed in recent years, with especially high instances of vacancy and turnover among security staff who are directly responsible for supervising incarcerated people. (Id. at pp. 61, 65.) From 2021 to 2023, GDC prisons had an

average vacancy rate of about 50% for correctional officers.  (Id. at p. 61.)  Such understaffing hampers the ability of GDC prisons to maintain security, respond to incidents of violence, and prevent the proliferation of contraband, including makeshift weapons.  (Id. at pp. 63, 67.) Understaffing inhibits prisons from carrying out critical safety procedures such as "security rounds," during which officers verify inmate wellness, learn of urgent medical needs, and identify security concerns like contraband or broken locks.  (Id. at p. 65.)  Inadequate staffing also allows unsupervised inmates to purchase, manufacture, and use weapons.  (Id.)

Plaintiff alleges that, in addition to understaffing, GDC's poor maintenance of aging prison facilities also contributed to the frequency of violent episodes involving makeshift weapons.  (Id. at pp. 74–79.)  According to Plaintiff, GDC prisons regularly failed to promptly fix things that broke within their facilities and to regularly evaluate, test, and document the condition of their security infrastructure.  (Id. at p. 77.)  Several facility audits in 2023 found that GDC prisons do not perform required checks on windows and doors to ensure they have not been cut or modified. (Id. at p. 78.)  These practices enabled GDC prisoners to craft, conceal, and circulate makeshift weapons, like homemade knives or "shanks," by sharpening objects and debris that spawned from the poorly maintained facilities, then hide and transport those weapons through breaches in the prisons' physical infrastructure and security systems.  (Id. at pp. 75–79.)

According to Plaintiff, the culture and day-to-day practices of GDC staff further exacerbate the violence and prevalence of contraband in GDC prisons.  (Id. at pp. 66–67.)  Plaintiff alleges that a 2023 GDC internal audit of several prisons found inadequate or incomplete facility-wide searches, failures in reporting procedures for incidents involving contraband, incomplete documentation of searches, irregular handling of discovered contraband, and inconsistency in inspecting packages for contraband.  (Id. at p. 67.)  From January 2022 through April 2023,

incidents of violence gradually increased across GDC's close security prisons. (Id. at p. 50.) During that time, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons. (Id.) Roughly 20% of these incidents involved a weapon and, between November 2021 and August 2023, Georgia prisons recovered 27,425 weapons. (Id. at pp. 50, 66.) According to Plaintiff, assaults and stabbings with man-made shanks are a "feature of life" at Georgia prisons, including SSP. (Id. at p. 50.)

These state-wide characteristics of GDC prisons were particularly prevalent at SSP during Beasley's tenure as Warden, which spanned from March 2, 2023, through the rest of the events giving rise to this action. (Id. at pp. 34–40.) Beasley allegedly failed to ensure proper maintenance of metal, ceramic, and plastic components of SSP's infrastructure. (Id. at p. 38.) SSP inmates used this crumbling infrastructure to craft makeshift weapons, including shanks, and would conceal and smuggle such contraband using holes and hiding spots in SSP's poorly maintained facilities. (Id. at p. 25.) Further, under Beasley's supervision, SSP staff did not conduct adequate security rounds to identify and remove contraband. (Id. at pp. 38–39.) Also, because of Beasley's supervision, customs, and practices as Warden, SSP did not adequately investigate the causes of violence in the prison or identify dangerous situations and avoid occurrences of violence. (Id. at pp. 39–40.) Many acts of violence were not referred for further investigation. (Id. at p. 40.) Indeed, Plaintiff alleges that, "[a]s a result of . . . Beasley's supervision, [SSP] had customs, practices and courses of conduct that are so widespread that they have acquired the force of law . . . whereby correctional employees would not conduct investigations into incidents of violence [or] correct them, [nor] search for and confiscate makeshift weapons from inmates, . . . [nor] maintain a guard presence in order to reduce violence." (Id. at p. 101.) Beasley thus "fostered an

4

. . . environment of violence which motivated and encouraged inmates [at SSP] to commit violence against each other." (Id.)

Plaintiff claims that Commissioner Oliver, Director Clark, and Warden Beasley were all aware that their management of GDC and SSP created dangerous and violent conditions for inmates. (Id. at pp. 79–85, 102–03.) For example, from 2022 through April 2023, reports available to GDC leadership disclosed 1,045 incidents of violence, including assaults, fights, and homicides. (Id. at p. 82.) Each GDC facility likewise produces a monthly report containing statistics on violence for review by wardens such as Warden Beasley. (Id.) Despite their awareness, Oliver, Beasley, and Clark failed to adequately monitor, repair, or remedy the dangerous situation of GDC facilities, or of SSP in particular. (Id. at pp. 79–85, 36–38.)

On April 28, 2023, Plaintiff was attacked and stabbed multiple times (the "Attack") while he was serving a sentence at SSP. (Id. at pp. 9–10.) On the day of the Attack, there were no guards around the area where Plaintiff was attacked, and SSP was understaffed. (Id. at p. 10.) Plaintiff alleges, upon information and belief, that his attackers used makeshift shanks, made from the crumbling infrastructure of SSP. (Id.) Plaintiff sustained life threatening injuries, including at least 14 stab wounds all over his body and fractures to his face. (Id. at p. 11.) Plaintiff alleges that Oliver, Clark, and Beasley's supervision caused and was a moving force behind Plaintiff's constitutional deprivations, personal injury, and other harms and damages because he was attacked with makeshift weapons that came from the infrastructure of SSP and that were smuggled about SSP without intervention, and because he was violently attacked due to a culture where violent incidents were not investigated. (Id. at p. 97.)

Plaintiff further alleges in his Amended Complaint that he did not receive adequate medical treatment in the wake of the Attack—both immediately after the Attack occurred and during his

subsequent recovery. (Id. at pp. 11–18.) The Amended Complaint alleges that, in the 30–35 minutes that passed between the Attack and when EMS arrived, the GDC employees in Plaintiff's presence did not provide him with any medical treatment even though he was suffering from obvious life-threatening injuries. (Id. at pp. 11–12.) Upon returning to SSP from the hospital, Plaintiff was placed in a holding cell for two days before being placed in solitary confinement. (Id. at pp. 14, 17.) Plaintiff alleges that, during this time, he did not receive adequate medical treatment for his Attack-related injuries—due in part to numerous instances wherein Unit Manager Martin refused to allow Plaintiff to go to the medical wing to receive care. (Id. at pp. 14–17.)

## II.    Procedural Background

Plaintiff filed suit in the State Court of Tattnall County. (See doc. 1-1.) Defendants removed the case to this Court, (doc. 1), and Plaintiff subsequently filed an Amended Complaint, (doc. 19). Prior to initially filing the suit, Plaintiff sent GDC an ante-litem notice of his intention to bring legal claims against it. (Id. at p. 8; doc. 19-1.) Seven of the eight counts in Plaintiff's Amended Complaint are asserted against the Moving Defendants:

- Count I alleges a "Section 1983 Claim Under [the] Eighth Amendment," against Defendant Martin, individually, for "Deliberate Indifference to Serious Medical Needs." (Doc. 19, pp. 85–91.)

- Count II is also against Defendant Martin, individually, alleging a "Section 1983 Claim Under [the] Eighth Amendment" for "Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs." (Id. at pp. 91–93.)

- Count IV alleges "Section 1983 Claims under [the] Eighth Amendment," against Defendant Beasley, individually, for "Supervisory [Liability] For Uncontrolled Violence Caused By Deficient Security Practices Such as Failures to Ensure Security Rounds/Guard

Presence, Failures to Control Contraband/Perform Maintenance, and Failures to Investigate Incidents of Violence." (Id. at pp. 98–103.)

- Count V alleges a "Section 1983 Claims under [the] Eighth Amendment," against Defendant Oliver, in his individual capacity, for "Supervisory [Liability] for Uncontrolled Violence at Georgia Prisons including Smith State Prison caused by a Severe Understaffing." (Id. at pp. 103–09.)

- Count VI alleges a "Section 1983 Claim under Eighth Amendment Cruel and Unusual Punishment" against Defendant Clark, in his individual capacity, for "Supervisory [Liability] for Uncontrolled Violence at Georgia Prisons including Smith State Prison caused by a Failure to Maintain Facilities." (Id. at pp. 109–13.)

- Count VII is a claim for "Punitive Damages" against Defendants Oliver, Clark, Adams, Beasley, and Martin, individually. (Id. at pp. 114–18.)

- Count VIII is a claim for "Negligence and Gross Negligence Liability Pursuant to O.C.G.A. § 50-21-20" against GDC. (Id. at pp. 118–24.)

The Moving Defendants eventually filed the at-issue Motion for a More Definite Statement or, in the Alternative, Motion to Dismiss, (doc. 27), and Plaintiff filed a Response, (doc. 32).

## DISCUSSION

Defendants first argue that, under Federal Rule of Civil Procedure 12(e), the Court should require Plaintiff to re-draft his entire Amended Complaint in a manner that provides a more definite statement of his pleadings. (Doc. 27-1, pp. 4–7.) Second, Defendants argue in the alternative that, should the Court decline to order a re-draft, some claims in the Amended Complaint should be dismissed. (Id. at pp. 7–13.) Defendants specifically argue that Count VIII should be dismissed in part and that Counts IV, V, and VI should be dismissed in their entirety. (Id.) For the below reasons, the Motion for a More Definite Statement is **DENIED** and the Motion to Dismiss is **GRANTED in part** and **DENIED in part**. (Doc. 27.)

## I.      Defendants' Motion for More Definite Statement is Denied.

Federal Rule of Civil Procedure 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Defendants assert that, under Rule 12(e), a more definite statement is warranted here because the Amended Complaint is "unnecessarily complicated and verbose," such that it violates Federal Rule of Civil Procedure 8's "short and plain statement" requirement, makes a response "nearly impossible," and ensures that discovery will be "complicated, far-reaching, and burdensome." (Doc. 27-1, pp. 4–6.) In particular, Defendants contend that, as part of a "pleading tactic" designed to "obfuscate and confuse," Plaintiff's 125-page Amended Complaint contains "redundant and seemingly irrelevant" facts—such as allegations about "the Department of Justice's recent investigation into the [GDC]," and "GDC internal audits of several prisons." (Id. at pp. 5–7.) Defendants assert that the Amended Complaint's resultant length and complexity "makes it difficult to ascertain what [Plaintiff's] claims—particularly his supervisory liability claims—are actually about." (Id. at p. 6.) Citing

8

authority from other circuits,[1] Defendants aver that a more definite statement is thus required to enable them to file a responsive pleading and avoid overbroad discovery.  (Id. at pp. 6–7.)

The Court disagrees with Defendants and finds that they are not entitled to a more definite statement.  Federal courts generally disfavor motions for a more definite statement.  See Euro RSCG Direct Response, LLC v. Green Bullion Fin. Servs., 872 F. Supp. 2d 1353, 1358 (S.D. Fla. 2012) (citing Clearwater Consulting Concepts, LLP v. Imperial Premium Fin., LLC, No. 09–81042–CIV, 2010 WL 916392, at *1 (S.D. Fla. Mar. 11, 2010)).  Such motions, indeed, are only to be granted when necessary to remedy an "unintelligible pleading."  Id. (citing Clearwater Consulting, 2010 WL 916392, at *1).  Plaintiff's Amended Complaint, while lengthy, is not "unintelligible."  Rather, contrary to Defendants' argument, the Amended Complaint is clear enough to satisfy Rule 8's requirement that Defendants have adequate notice of the basis for each of the claims against them.  Indeed, by making discrete arguments in their Motion to Dismiss addressing Plaintiff's various claims, Defendants themselves show that those claims are identifiable enough to enable them to file a responsive pleading.  See Thomas v. Ashe, No. 2:23-cv-023, 2023 WL 2761305, at *2 (S.D. Ga. Apr. 3, 2023) (denying motion for more definite statement because, "as shown by [d]efendant's motion to dismiss, [p]laintiff's claims are sufficiently identifiable to enable [d]efendant to respond").  Therefore, under Rule 12(e), the Amended Complaint is not "so vague or ambiguous that . . . [Defendants] cannot reasonably prepare a response."  Defendants' Motion for a More Definite Statement is accordingly **DENIED**.

**II.     Defendants' Motion to Dismiss is Granted in Part and Denied in Part.**

---

[1]  Defendants do not cite any Eleventh Circuit authority to support their Motion for a More Definite Statement.  (See doc. 27, pp. 4–7.)  At any rate, even if the cases from other circuits to which Defendants do cite were authoritative, the Court still would not grant Defendants' Motion for a More Definite Statement because those cases addressed facts that are meaningfully distinct from the facts here.

Having denied Defendants' Motion for a More Definite Statement, the Court must next address Defendants' Motion, in the alternative, to Dismiss Counts IV, V, VI, and VIII of the Amended Complaint. (Doc. 27-1, pp. 7–13.) When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the complaint and limit its consideration to the pleadings and attached exhibits. Bell Atlantic Corp v. Twombly, 550 U.S. 544, 556 (2007); Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft, 556 U.S. at 678. Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678). The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft, 556 U.S. at 678 (internal quotations and citation omitted). Dismissal under Rule 12(b)(6) is also permitted "when,

10

on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12(b)(6) allows a court "to dismiss a claim on the basis of a dispositive issue of law").

Here, Defendants first argue that Count VIII for negligence against GDC should be partially dismissed as barred by sovereign immunity because, as to some claims in that count, Plaintiff failed to satisfy Georgia's ante-litem requirement. (Doc. 27-1, pp. 7–9.) Next, Defendants argue that Counts IV, V, and VI—seeking to hold Beasley, Oliver, and Clark, respectively, liable for violations of Plaintiff's Eighth Amendment rights—should be dismissed both because the claims are barred by qualified immunity and because they fail to satisfy the applicable standard for supervisory liability. (Id. at pp. 9–13.) The Court addresses each argument in turn.

### A.       Count VIII for Negligence against GDC is Dismissed in Part.

Count VIII is a Georgia-law claim for negligence and gross negligence against GDC, alleging that GDC failed to provide Plaintiff with adequate medical care both immediately after the Attack and after Plaintiff returned to SSP from the hospital. (Doc. 19, pp. 118–24.) Defendants argue that, to the extent Count VIII is based on GDC's medical care immediately after the Attack, the count should be dismissed as barred by sovereign immunity. (Doc. 27-1, pp. 7–9.) The Court agrees.

The doctrine of sovereign immunity generally bars private citizens from suing "arms of the state," like GDC, for damages. Stroud v. McIntosh, 722 F.3d 1294, 1297 (11th Cir. 2013) (quoting N. Ins. Co. of N.Y. v. Chatham Cnty., 547 U.S. 189, 193 (2006)). When a state removes a case to federal court, as Defendants have here, whether the state has retained its sovereign immunity from

11

liability for Plaintiff's particular claims is a question of the state's law.[2]   Though Georgia law generally provides that sovereign immunity bars suits against the state, the Georgia Tort Claims Act (the "GTCA") waives that immunity for torts committed by state officers and employees while acting within the scope of their official duties.   O.C.G.A. § 50-21-23.   For the waiver to apply, however, potential tort claimants must provide the state with ante-litem notice of their claim before filing suit, (O.C.G.A. § 50-21-26), so as to "ensur[e] that the State receives adequate notice of the claim to facilitate settlement before the filing of a lawsuit."   Williams v. Wilcox State Prison, 799 S.E.2d 811, 813 (Ga. Ct. App. 2017) (alterations adopted) (quoting Dorn v. Ga. Dep't of Behav. Health & Dev. Disabilities, 765 S.E.2d 385, 387 (Ga. Ct. App. 2014)).   The burden of establishing a waiver of sovereign immunity—and, in turn, compliance with the ante-litem requirement— belongs to the party asserting such waiver.   See Franklin v. Ga. Dep't of Pub. Safety, No. 4:24-cv-00172, 2025 WL 3247950, at *2 (N.D. Ga. Mar. 3, 2025) (citing Dep't of Transp. v. Mixon, 864 S.E.2d 67, 70 (Ga. Ct. App. 2021)).   If that party fails to meet this burden, then no waiver of sovereign immunity has occurred and the court must dismiss the claim for lack of subject matter jurisdiction.   See id. (citing Dep't of Pub. Safety v. Johnson, 806 S.E.2d 195, 197 (Ga. Ct. App. 2017)).

To satisfy the ante-litem requirement, the GTCA requires the following:

---

[2]  Federal and state law afford two potential immunity defenses to claims brought against a state: (1) general immunity from suit in a federal forum; and (2) immunity from liability for particular claims.  See Musson v. Jones, No. 4:22-cv-124, 2023 WL 2587490, at *11 (S.D. Ga. Mar. 21, 2023) (citing Stroud, 722 F.3d at 1300–01).  Rightly, Defendants argue for the second type of immunity only. (Doc. 27-1, pp. 7–9.)  Though GDC is generally immune from suit in a federal forum under the Eleventh Amendment and the Georgia Tort Claims Act, the Supreme Court of the United States has established that when a state removes to federal court, as Defendants have here, the state waives general federal forum immunity by voluntarily invoking federal jurisdiction.  Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 624 (2002). States that have removed a case thereby retain sovereign immunity only to the extent that the defense would have been available in state court for the plaintiff's particular claims.  Stroud, 722 F.3d at 1302.  Here, GDC has thus waived its general immunity from suit in a federal forum and the Court's inquiry is limited to whether GDC is immune from Plaintiff's negligence claims under Georgia law.

> A notice of claim under this Code section shall state, to the extent of the claimant's knowledge and belief and as may be practicable under the circumstances, the following: (A) The name of the state government entity, the acts or omissions of which are asserted as the basis of the claim; (B) The time of the transaction or occurrence out of which the loss arose; (C) The place of the transaction or occurrence; (D) The nature of the loss suffered; (E) The amount of the loss claimed; and (F) The acts or omissions which caused the loss.

O.C.G.A. § 50-21-26(a)(5).  Defendants argue that, insofar as Count VIII seeks to recover for GDC's allegedly negligent medical treatment immediately after the Attack, Plaintiff fails the ante-litem requirement at the final element because his notice did not include GDC's post-Attack care as an "act or omission" for which he intended to bring suit.  (Doc. 27-1, p. 8.)  According to Defendants, the only act or omission in the ante-litem notice related to GDC's medical care is described after Plaintiff's description of the Attack and trip to the emergency room, when Plaintiff states that, "[u]pon [Plaintiff's] return to Smith State Prison, [Plaintiff] was subsequently denied adequate medical attention as he attempted to recover from [his] wounds." (Id. (citing doc. 19-1, p. 2).)  Notwithstanding this limited description, Defendants assert, Count VIII seeks to recover for both GDC's post-hospital treatment and GDC's medical care immediately after the Attack. (Id.)  Defendants argue that, because Plaintiff's notice only mentions the negligent care he received "[u]pon his return," Plaintiff has failed to satisfy the ante-litem requirement as to any claims arising from GDC's other "acts or omissions."  (Id. at pp. 8–9.)  Thus, Defendants aver, GDC has not waived sovereign immunity as to Plaintiff's claim for negligent medical care immediately after the Attack and Count VIII should be dismissed to the extent it seeks to recover on that basis.  (Id.)

In response, Plaintiff maintains that GDC waived sovereign immunity for *all* the claims in Count VIII.  (Doc. 32, pp. 13–14.)  Plaintiff claims that the applicable standard is not "hyper-technical," and thus his written notice's statement that "medical negligen[ce] claims would be

13

brought" was enough to satisfy the ante-litem requirement for both his post-hospital claims and his claims arising from GDC's care "directly after the attack." (Id.)  The Court is not convinced.

Georgia courts have established that claimants must "strictly comply" with the GTCA's ante-litem requirement to establish a waiver of sovereign immunity.  Williams, 799 S.E.2d at 813 (quoting Dorn, 765 S.E.2d at 387).  As Plaintiff mentions, adherence to the statute need not be "hyper-technical."  Id. (quoting Dorn, 765 S.E.2d at 387).  But courts typically eschew rigid application of the ante-litem rule only when "a hyper-technical construction . . . would not measurably advance the purpose of the GTCA's notice provisions," id. (quoting Dorn, 765 S.E.2d at 385), or because "claimant[s] may have imperfect information regarding various facets of [their] claim[s] at the time [their] notice is submitted," Dorn, 765 S.E.2d at 386–87 (quoting Cummings v. Georgia Department of Juvenile Justice, 653 S.E.2d 729, 732 (Ga. 2007)).  Otherwise, courts enforcing "strict compliance" with the ante-litem rule generally abide by the principle that "substantial compliance is not strict compliance.  Strict compliance is exactly what it sounds like: strict."  Williams, 799 S.E.2d at 813 (quoting DeFloria v. Walker, 732 S.E.2d 121, 124 (Ga. Ct. App. 2012)).  Courts have accordingly found the GTCA's ante-litem requirement to be unsatisfied when a claimant alleges different acts or omissions in the complaint than in the notice and makes no showing that he had imperfect information when drafting the notice, or that strict enforcement would not advance the purpose of the provision.

This Court's ruling in Arenas v. Georgia Department of Correction, is instructive.  No. 4:16-cv-320, 2018 WL 988099, at *1 (S.D. Ga. Feb. 20, 2018).  In that case, a prisoner committed suicide while incarcerated in SSP and the prisoner's estate brought negligence claims against several Georgia agencies.  Id. at *2.  The estate's complaint alleged that one agency had failed to accommodate the prisoner's mental disabilities prior to his suicide, and that another agency had

14

inadequately responded to the fatal suicide attempt. Id. However, unlike the complaint, the estate's ante-litem notice had only alleged that the prisoner received inadequate "access to medical treatment *prior* to his suicide," and "did not provide any description of the acts or omissions relating to how the officers negligently *responded* to [the prisoner's] suicide." Arenas v. Ga. Dep't of Corr., No. 4:16-cv-320, 2019 WL 4547074, at *2 (S.D. Ga. Sept. 19, 2019) (second emphasis added) (denying reconsideration). Accordingly, though the claims arising from *pre-suicide* care survived, the Court dismissed the estate's claims to the extent that they were based on the allegedly negligent *response* to the prisoner's suicide. Id.; see also, e.g., Williams, 799 S.E.2d at 813 ("[B]ecause the ante-litem notices made no mention of any alleged negligent acts or omissions on the part of the [GDC] with regard to uneven flooring in the bathroom, which was the basis for [the plaintiff's] negligence action against it, she failed to strictly comply with the GTCA's notice requirement.").

Alternatively, cases finding that the ante-litem requirement is satisfied contain facts that are readily distinguishable from the facts before the Court. In a recent case, Conley v. Oliver, an SSP inmate was beaten to death by a fellow prisoner and the inmate's mother brought a negligence action against GDC—alleging in her complaint that, after the beating, GDC "caused [her son] to suffer from worse medical injuries due to delayed medical treatment." No. 1:25-cv-1313, 2026 WL 880601, at *6 (N.D. Ga. Mar. 31, 2026). Though the complaint alleged the guards failed to call an ambulance upon discovering her son, the only relevant allegations in the mother's ante litem were that her son was beaten unconscious "[o]n the night of February 5," and was found the following morning "around 5:00 am." Id. at *7. The ante-litem notice did, however, specify that it was drafted based on the "limited information" available to that point, and the mother's complaint further described being "stonewalled for weeks when seeking information." Id. The

15

Northern District of Georgia eventually rejected GDC's argument that the delayed-treatment claims should be dismissed for failing the ante-litem requirement. Id. at *5–7. First, the court reasoned, given "any absent details in [the mother's] ante[-]litem notice are . . . a result of insufficient information provided to her," a "hyper-technical construction" of the GTCA's notice requirement would be inappropriate. Id. at *6–7. Second, according to the court, the mother's ante-litem notice in fact did adequately allege the acts and omissions underlying the delayed-treatment claim by "point[ing] to the period of time that elapsed between [the] assault and [her son's] discovery by the [GDC] officers," and thereby "allud[ing] to the problematic delay in [her son's] treatment."[3] Id. at *7.

It is clear from this case law that, here, Plaintiff's ante-litem notice is deficient insofar as he seeks to recover for Defendant's immediate response to the Attack. Mirroring Arenas, where the estate's notice only alleged a lack of treatment "prior to" the prisoner's suicide, Plaintiff's ante-litem alleges that he received inadequate medical attention only "[u]pon his return to [SSP] . . . as he attempted to recover from [his] wounds." (Doc. 19-1, p. 2.) Further, neither of the considerations that led the Conley court to find that the ante-litem requirement was satisfied in that case are present here. First, unlike in Conley, Plaintiff has not suggested that he lacked the requisite information to notify Defendant of his immediate-response claim—either in the ante litem or in his Amended Complaint. (See id; see also doc. 19.) Second, even if "hyper-technical construction" of the GTCA were not appropriate here, the Court cannot interpret Plaintiff's ante-

---

[3] The only case Plaintiff cites in his Response to argue that his ante-litem notice gave adequate notice of the immediate-treatment claims, Bryant v. Harris County, No. 4:18-CV-106, 2018 WL 5316359, at *1 (M.D. Ga. Oct. 26, 2018), is even more readily distinguishable from the present facts. In that case, the court merely found the plaintiff's ante-litem notice sufficiently identified GDC by alleging misconduct by prison employees who, in turn, acted as GDC's agents. Id. at *10–11. The holding thus sheds little light on how the Court should rule here, where Plaintiff's ante-litem notice makes no mention of some acts and omissions for which he now brings suit.

litem notice as even alluding to Defendant's potentially inadequate care directly after the Attack. Indeed, whereas the <u>Conley</u> notice at least referenced a considerable delay between the son's beating and his discovery by the guards, the lone medical-care allegation in Plaintiff's ante-litem notice inherently excludes immediate-response treatment by specifically referencing the care Plaintiff received "[u]pon his return to [SSP]." (Doc. 19-1, p. 2.) As to the immediate-treatment claim in Count VIII, Plaintiff has thus failed to satisfy the GTCA's ante-litem requirement for establishing GDC waived sovereign immunity. (Doc. 19, pp. 118–24.) The Court therefore **GRANTS** Defendants' Motion to Dismiss Count VIII to the extent that Count VIII asserts a negligence claim against GDC based on the medical treatment Plaintiff received immediately after the Attack.[4]

### B. Plaintiff's Claims for Eighth Amendment Supervisory Liability Survive Dismissal.

Defendants next argue that Counts IV, V, and VI—against Beasley, Oliver, and Clark, respectively—should be dismissed. (Doc. 27-1, pp. 9–13.) "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." <u>Marsh v. Butler Cnty.</u>, 268 F.3d 1014, 1028 (11th Cir. 2001), <u>overruled in part on other grounds by</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009). Counts IV, V, and VI allege that Beasley, Oliver, and Clark's subordinates deprived Plaintiff of this constitutional right in the

---

[4] On the other hand, to the extent that Defendants argue that any portion of Plaintiff's claims should be dismissed as barred by sovereign immunity under the "assault and battery exception," the Court rejects their argument. (<u>See</u> doc. 27-1, p. 9 n.4.) Contrary to Defendants' suggestion, the GTCA provision indicating the state is not liable for losses resulting from assault and battery, O.C.G.A. § 50-21-24(7), only provides immunity against claims alleging assault or battery by state actors. <u>See, e.g.,</u> <u>Bryant</u>, 2018 WL 5316359, at *9 ("If [p]laintiff's claims were based solely on a guard's use of excessive force against Burden, her claims would clearly be barred by the assault and battery exception to the waiver of sovereign immunity. But that is not the end of the inquiry because [p]laintiff claims that there was a second cause of Burden's death: the [c]orrections [o]fficer [d]efendants' alleged decision to wait an unreasonable amount of time before responding to Burden's collapse."). The "assault and battery exception" does not make the state immune from suits like Plaintiff's, where a state actor allegedly failed to protect a claimant from assault by third party.

events surrounding the Attack, and Plaintiff seeks, in these counts, to recover from those Defendants under Section 1983 via a theory of supervisory liability.  (Doc. 19, pp. 98–113.) Defendants argue that the Court should dismiss these three counts both because they are barred by qualified immunity and because, even if immunity does not apply, Plaintiff has failed to establish that Beasley, Oliver, and Clark can be liable for their subordinates' conduct under the doctrine of supervisory liability.  (Doc. 27-1, pp. 9–13.)

### (1)    Qualified Immunity

Defendants argue that Beasley, Oliver, and Clark are entitled to qualified immunity.  (Id. at pp. 12–13.)  The party asserting the defense of qualified immunity bears the initial burden of showing that they were acting within the scope of their discretionary authority at the time of the alleged constitutional violation.  Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).  Because it is uncontested that Defendants have made this showing here, the burden shifts to Plaintiff to show that qualified immunity is not appropriate.  Id.  To satisfy that burden, Plaintiff must show that: (1) his allegations "make out a violation of a constitutional right"; and (2) the right at issue was clearly established at the time of the alleged deprivation.  Pearson, 555 U.S. at 232; see also Turner v. Dunn, 799 F. Supp. 3d 1208, 1216 (M.D. Ala. 2025).  Plaintiff has satisfied this two-part burden—and thus demonstrated that qualified immunity does not apply—by plausibly alleging a violation of his clearly established Eighth Amendment rights.

First, Plaintiff's Amended Complaint makes out a constitutional violation by alleging that the Attack and related events violated his Eighth Amendment right against cruel and unusual punishment.  (See generally doc. 19.)  Defendants, in fact, do not dispute that Plaintiff has satisfied

18

this element of his qualified-immunity burden—arguing only that the right was not clearly established. (See doc. 27-1, pp. 12–13.) Nevertheless, to avoid confusion (and delineate Plaintiff's underlying constitutional injuries from the separate issue of supervisory liability), the Court will briefly explain the constitutional violations at issue.

The Eighth Amendment, as mentioned above, mandates that officials "protect prisoners from violence inflicted upon them by other prisoners." Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014). For a given act of inmate-on-inmate violence to constitute a deprivation of this right, a plaintiff must prove that an official was "deliberately indifferent" to a "substantial risk of serious harm to an inmate who suffers injury." Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (citing Farmer v. Brennan, 511 U.S. 825, 828 (1994)). This in turn requires plaintiffs to show: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting Lane, 835 F.3d at 1307). Though this standard typically requires failure-to-protect claimants to point to a specific threat, a constitutional violation can also arise from an official's indifference to a "generalized risk of violence," or "history of widespread abuse." See, e.g., id. at 1235; Brown v. Dunn, 760 F. Supp. 3d 1326, 1336 (M.D. Ala. 2024); Turner, 799 F. Supp. 3d at 1217. Indeed, here, Counts IV, V, and VI each satisfy the three requirements for alleging an Eighth Amendment failure-to-protect violation by alleging such a generalized risk.

To satisfy the first element of the failure-to-protect standard, showing a "substantial risk of serious harm," a plaintiff bringing a generalized-risk claim must point to "specific features of a facility or its population" that render the facility particularly violent. Marbury, 936 F.3d at 1235; see also Turner, 799 F. Supp. 3d at 1217. Plaintiff has met this requirement in each of the Counts at issue by identifying numerous features of SSP that made it an especially violent prison. As

19

detailed in the Background section above, Plaintiff alleges that violent attacks and stabbings with makeshift weapons were a feature of life at SSP and describes dozens of homicides and assaults in the prison between 2020 and 2023.  (See doc. 19, pp. 18–25.)  Plaintiff asserts that SSP's crumbling infrastructure provided inmates with the materials and space for crafting, concealing, and transporting weapons and other contraband, and allowed for undetected movement by inmates throughout the prison.  (See id. at pp. 15–26, 31–33.)  According to Plaintiff, this environment— in which guards did not conduct adequate security rounds, intervene in the proliferation of weapons and other contraband, or investigate the cause of violent attacks—further entrenched SSP's violent culture.  (See id. at pp. 15–26, 31–37.)  Plaintiff alleges that all these issues were exacerbated by chronic understaffing of Georgia prisons state-wide, including SSP.  (See id. at pp. 60–74.)  The Eleventh Circuit Court of Appeals has consistently determined that these types of specific features pose a generalized risk of violence sufficient to satisfy the "substantial risk of serious harm" requirement.  See, e.g., Marsh, 268 F.3d at 1029 (jail that suffered from overcrowding, routine understaffing, broken locks, and uncontrolled flow of weapons posed an "objectively substantial risk of serious harm"); Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995) (substantial risk of serious harm posed by jail where "inmate-on-inmate violence occurred regularly"); Dickinson v. Cochran, 833 F. App'x 268, 272 (11th Cir. 2020) (jail that allowed introduction of contraband and inadequately supervised inmates posed substantial risk of serious harm).

The second failure-to-protect element, deliberate indifference to the substantial risk, "has both a subjective and an objective component."  Marbury, 936 F.3d at 1233.  Subjectively, an official must have known that their own conduct put the plaintiff at substantial risk of serious harm. Wade v. McDade, 106 F.4th 1251, 1258 (11th Cir. 2024) (en banc).  Objectively, "the official must have responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to

reduce the harm' but knowingly or recklessly declined to act." Marbury, 936 F.3d at 1233 (quoting Rodriguez v. Sec'y Dep't of Corr., 508 F.3d 611, 620 (11th Cir. 2007)).  As explained below, this two-part assessment is distinct from the separate issue of whether, as supervisors, Beasley, Oliver, and Clark were themselves on notice of the need to correct widespread constitutional abuses.  To make out a constitutional violation for purposes of qualified immunity, a claimant need only allege that some official, not necessarily the supervisory defendant themselves, was deliberately indifferent.  Plaintiff's Amended Complaint asserts, as to each of the supervisory Defendants, that their "subordinates act[ed] with deliberate indifference to Plaintiff's constitutional rights."  (Doc. 19, pp. 102, 107, 112.)  Reading these allegations in the light most favorable to Plaintiff, and considering that Defendants do not dispute that Plaintiff has plausibly alleged deliberate indifference by the subordinate officials, (see generally doc. 27-1), the Court finds that the second element of alleging a failure-to-protect violation is satisfied for purposes of qualified immunity.

Likewise, by asserting that the Attack was caused by the subordinate officials' deliberate indifference to the violent features of SSP, Plaintiff has established "causation," the third and final element of making out a failure-to-protect Eighth Amendment violation.  Plaintiff alleges, for each of the at-issue claims, that other inmates managed to attack him with makeshift weapons because of the subordinates' minimal guard presence, poor maintenance of prison infrastructure, failure to intervene in the proliferation of contraband, and failure to investigate violence. (Doc. 19, pp. 102, 107, 112.)  Again, Defendants do not dispute that Plaintiff has adequately alleged that the subordinates' deliberate indifference caused the Attack.  (See generally doc. 27-1.)  By thereby satisfying the three elements for alleging a violation of his Eighth Amendment right to protection from other prisoners, Plaintiff has sufficiently made out a constitutional violation that satisfies the first step of his burden to show qualified immunity does not apply.

21

Second, Plaintiff's constitutional right was clearly established at the time of the alleged deprivation. The Eleventh Circuit has identified three ways for a plaintiff to demonstrate a right was clearly established at the time of an alleged violation. First, he may "show that a materially similar case has already been decided." Corbitt v. Vickers, 929 F.3d 1304, 1312 (11th Cir. 2019) (internal quotation omitted). Second, he may point to broad statements of legal principles that apply with "obvious clarity to the circumstances." Crocker v. Beatty, 995 F.3d 1232, 1240 (11th Cir. 2021) (internal quotation omitted). Third, he may prove that the conduct was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." Id. (citation and quotation marks omitted). In his Response, Plaintiff points to multiple Eleventh Circuit cases, decided well before Plaintiff's alleged constitutional injury in April 2023, that not only recognize the at-issue Eighth Amendment right to protection from inmate-on-inmate violence, but which confirm that such right is, indeed, clearly established for purposes of qualified immunity. (Doc. 32, pp. 19–20 (citing Marsh, 268 F.3d at 1029–30; Hale, 50 F.3d at 1584–85; LaMarca v. Turner, 995 F.2d 1526, 1537–39 (11th Cir. 1993)).) It is therefore plain that the Eighth Amendment right at issue was clearly established when the violation occurred.

Defendants nevertheless argue that Plaintiff's right was not clearly established because, according to them, Plaintiff provides no authority suggesting Beasley, Oliver, or Clark are subject to supervisory liability. (Doc. 27-1, pp. 12–13.) This argument misunderstands the nature of the Court's "clearly established" inquiry. The relevant question is whether the constitutional right violated by Defendants' subordinates was clearly established—not whether it was clearly established that the supervisory Defendants would be amenable to suit for that violation. See Amnesty Int'l v. Battle, 559 F.3d 1170, 1184–85 (11th Cir. 2009) (determining defendants were not entitled to qualified immunity on plaintiff's supervisory liability claim based purely on the fact

22

that the underlying constitutional right was clearly established); see also Smith v. Wayne Cnty., 742 F. Supp. 3d 1350, 1374 (S.D. Ga. 2024) ("[D]etermination of whether [plaintiff's] constitutional right was clearly established for [p]laintiff's supervisory liability claims hinges on whether the right violated by [defendants' subordinates] was clearly established."). It is the doctrine of supervisory liability, addressed in the next section, that governs Defendant's potential *liability* for their subordinate's unconstitutional conduct. As to qualified immunity, the Court finds Plaintiff has satisfied his two-part burden and holds that Defendants Beasley, Oliver, and Clark are not entitled to immunity for the claims against them in Counts IV, V, and VI.

### (2)    Supervisory Liability

Having alleged that Defendants Beasley, Oliver, and Clark's subordinates violated Plaintiff's Eighth Amendment rights in the events surrounding the Attack, Counts IV, V, and VI seek to recover from those Defendants under Section 1983 via a theory of supervisory liability. (Doc. 19, pp. 98–113.) As explained in the Court's prior order, (doc. 36), Section 1983 does not make supervisors automatically liable for their subordinates' actions. See Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), overruled in part on other grounds by Pearson, 555 U.S. 223. Instead, Section 1983 only allows for supervisory liability "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Myrick v. Fulton Cnty., 69 F.4th 1277, 1297 (11th Cir. 2023) (internal quotations omitted). If a plaintiff satisfies either of these requirements, then the supervisor, in addition to their subordinates, is considered to have violated the Constitution such that they are themselves subject to liability. Ingram v. Kubik, 30 F.4th 1241, 1254 (11th Cir. 2022) (because vicarious liability does not apply, Section 1983's supervisory-liability doctrine assesses whether "the supervisor, through his own actions, violated

23

the Constitution"). Because Plaintiff does not allege that Beasley, Oliver, or Clark personally participated in the unconstitutional conduct, he thereby must allege facts that show a "causal connection" between those Defendants' actions and the supposed Eighth Amendment violation. Myrick, 69 F.4th at 1297–98 ("Here, Appellants do not allege that Sheriff Jackson personally participated in the alleged unconstitutional conduct, so they must allege facts that show a causal connection between his actions and the alleged constitutional deprivation."). Defendants argue that Plaintiff's supervisory liability claims should be dismissed because he has failed to plausibly allege such a connection. (Doc. 27-1, pp. 9–12.) The Court disagrees.

When it comes to Eighth Amendment failure-to-protect claims like the ones here, plaintiffs can establish a causal connection sufficient for supervisory liability in one of at least three ways, by showing:

> (1) a history of widespread abuse put[] the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fail[ed] to do so; (2) a supervisor's custom or policy result[ed] in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

Myrick, 69 F.4th at 1298 (citing Matthews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)); see also Cottone, 326 F.3d at 1359.[5] As best the Court can tell, Counts IV, V, and VI all allege that

---

[5] For Eighth Amendment claims alleging failure to protect from inmate violence, case law across the Eleventh Circuit is somewhat confusing when distinguishing the "deliberate indifference" standard for determining whether a constitutional violation occurred from the "causation" framework for assessing supervisory liability. See, e.g., Barefield v. Dunn, 688 F. Supp. 3d 1026, 1066 n.17 (M.D. Ala. 2023) ("there has been confusion" in distinguishing "the deliberate-indifference standard, when applied to excessive-inmate-violence conditions" from "the supervisory liability for subordinate action causation framework"); see also Conley, 2026 WL 880601, at *17 ("The Eleventh Circuit's case law as to when supervisory liability attaches based on a 'history of widespread abuse' is, to put it kindly, less than clear."); id. (collecting cases). This probably owes to the fact that each standard's underlying inquiries overlap considerably. See Barefield, 688 F. Supp. 3d at 1066 n.17. Though the Court has strived to delineate the deliberate-indifference and supervisory-causation standards here, it also notes that differentiating the two tests may not mean much in practice. See id. To that end, the Court clarifies that these doctrinal observations would not have led to a different outcome in its prior Order in this case, denying Defendant Adams' motion to dismiss the supervisory liability claim against him in Count III. (Doc. 36.)

24

supervisory liability exists under both the first and second options. (See doc. 19, pp. 98–113.) Upon reviewing the Amended Complaint, the Court finds that Plaintiff has established a sufficient causal connection for each of his supervisory liability claims via the first option, "history of widespread abuse."

The Eleventh Circuit has established that a "history of widespread abuse" puts supervisors on notice of the need for corrective action when "[t]he deprivations that constitute widespread abuse . . . [are] obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."[6] Christmas v. Harris Cnty., 51 F.4th 1348, 1355 (11th Cir. 2022) (quoting Keith v. DeKalb Cnty., 749 F.3d 1034, 1048 (11th Cir. 2014)). Under these criteria, Counts IV, V, and VI each allege a history of abuse that was enough to have notified the respective Defendants of a need to act. Count IV alleges that Defendant Beasley, as acting Warden at SSP during the Attack, was put on notice of the need to act by widespread abuse "with regards to inmate-on-inmate violence, understaffing, failures to investigate violence, and the free flow of contraband." (Doc. 19, p. 100.) Count V similarly alleges that Defendant Oliver, as Commissioner of GDC, was put on notice of the need to act by widespread abuse "with regards to inmate-on-inmate violence, severe understaffing, insufficient security rounds, failures to keep a security presence, the free-flow of contraband, and delays in medical care as a result of understaffing." (Id. at pp. 105–06.) And Count VI alleges that Defendant Clark, as Director of Engineering and Construction Services for GDC, was put on notice of the need to act by widespread abuse "with regards to inmate-on-inmate

---

[6] The standard for showing causal connection via history of widespread abuse should not be confused with the "generalized risk of violence" inquiry that the Court undertook to determine whether Plaintiff's constitutional rights were violated in the first place. As explained above, by establishing Defendants' subordinates were deliberately indifferent to a generalized risk of violence, Plaintiff has sufficiently alleged that the subordinates violated his Eighth Amendment right to protection from other inmates. The Court now must consider the separate question of whether the supervisory Defendants could be liable—under the facts alleged by Plaintiff—for that violation on the ground that a "history of widespread abuse" notified them of the need to act, and their failure to do so caused the subordinates' unconstitutional conduct.

violence, a mass makeshift knife problem, and high incidences of stabbings." (Id. at pp. 110–11.) In each instance, according to Plaintiff, the "history of widespread abuse [] was obvious, flagrant, rampant, and of continued duration." (Id. at pp. 100, 105, 110.) Specific details alleged in the Amended Complaint support this assertion. For instance, as to inmate violence, Plaintiff claims that at least seventeen homicides and dozens of other violent attacks occurred at SSP between 2020 and 2023 and provides a list and descriptions of numerous such incidents in the Amended Complaint. (See id. at pp. l9–25.) Likewise, as to the "free flow of contraband" and the "makeshift knife problem," Plaintiff claims that "[a]ssaults and stabbings with man-made 'shanks' are a feature of life at Georgia [p]risons, which includes [SSP]," (id. at p. 50.); states that weapons made from SSP's crumbling infrastructure posed a "constant risk of danger," (id. at p. 25); details numerous pre-2023 incidents of violence at SSP involving self-made weapons, (id. at pp. 19–23); and indicates that about 20% of some 1,400 incidents of violence across Georgia prisons from January 2022 through April 2023 involved a weapon, (id. at p. 50). These allegations show that the abuses at issue were "obvious, flagrant, rampant and of continued duration," such that each supervisory Defendant had notice of the need for corrective action. And Plaintiff alleges that, despite being "on notice of the need to take action," each supervisory Defendant "failed to do so." (Id. at pp. 100, 106, 111.) Plaintiff's allegations go well beyond the threadbare recital and conclusory allegations against prison supervisory officials that this Court and others often reject. For instance, as to Defendant Clark, Plaintiff does not merely rely on Clark's job title. He also plausibly alleges that Clark was directly responsible for maintaining SSP's infrastructure, that Clark knew that infrastructure was crumbling, that Clark knew prisoners were often using pieces of that crumbling infrastructure to carry out assaults like the Attack, and that Clark failed to address this widespread risk. Plaintiff backed up these allegations with even more details including that

26

audits which Clark would have received showed the facilities were not being maintained and that Clark received other data including reports of incidents at the prison.

Plaintiff has therefore shown a sufficient causal connection between each of the supervisory Defendants' conduct and the deprivation of his constitutional rights.[7]    Accordingly, Counts IV, V, and VI plausibly state a claim for supervisory liability against Defendants Oliver, Beasley, and Clark.    Because, as explained above, Defendants are not entitled to qualified immunity for those claims, Defendants' Motion to Dismiss is **DENIED**.

### CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** the Moving Defendants' Motion for a More Definite Statement or, in the Alternative, Motion to Dismiss.  (Doc. 27.)  Because the claims in Plaintiff's Amended Complaint are sufficiently identifiable to enable Defendants to file a responsive pleading, Defendants' Motion for a More Definite Statement is **DENIED**.  (Id.)  Likewise—because Defendants Oliver, Clark, and Beasley are not entitled to qualified immunity, and Plaintiff has plausibly alleged Section 1983 supervisory liability claims against them—the Court **DENIES** the Moving Defendants' Motion to Dismiss insofar as that Motion seeks dismissal of Counts IV, V, and VI.  (Id.)  The Court does, however, **GRANT** the Moving Defendants' Motion to Dismiss insofar as that Motion seeks partial dismissal of Count

---

[7] The Court acknowledges that, in Conley, 2026 WL 880601, at \*20–22, a recent order involving similar claims and parties, the Northern District of Georgia dismissed an Eighth Amendment supervisory liability claim against Director Clark that is analogous to Plaintiff's claim against Clark here, Count VI.  That opinion, of course, is not binding precedent for this Court.  Washington v. Rivera, 939 F.3d 1239, 1244 n.8 (11th Cir. 2019) ("[D]istrict court opinions are not binding precedent." (citing Camreta v. Greene, 563 U.S. 692, 709 (2011))).  In coming to a seemingly different conclusion, the Court notes that, notwithstanding Conley, courts in this circuit have previously recognized claims like Count VI, where a failure-to-protect claimant asserts supervisory liability against an official whose poor maintenance of prison infrastructure allegedly led to an inmate-on-inmate attack.  See Barefield, 688 F. Supp. 3d at 1059, 1080–99 (denying motion to dismiss inmate's failure-to-protect claim against Director of Facilities Management for Alabama Department of Corrections).

VIII against GDC.  (Id.)  Specifically, because Plaintiff did not provide ante-litem notice of his intent to bring such a claim, Count VIII is **DISMISSED** to the extent it alleges a negligence claim against GDC based on the medical treatment Plaintiff received immediately after the Attack.[8]

**SO ORDERED**, this 10th day of July, 2026.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[8]  Though Defendant Kathy Martin is listed as joining in the Moving Defendants' Motion for a More Definite Statement or, in the Alternative, Motion to Dismiss, the Motion makes no argument about the claims against Martin.  (See generally doc. 27; doc. 27-1.)  Accordingly, to any extent the Motion seeks dismissal of the claims against Martin in Counts I, II, and VII, the Motion is **DENIED**.  (Doc. 27.)